In the Matter of the TERMINATION OF the PARENT–CHILD RELA-TIONSHIP OF A.B., child,

and

Angela B. (Mother) and Brian J. (Father), Appellants–Respondents,

v.

Lake County Department of Child Services, Appellee–Petitioner.

No. 45A03–0712–JV–567.

Court of Appeals of Indiana.

June 3, 2008.

Transfer Denied Sept. 12, 2008.

Marce Gonzalez, Jr., Dyer, IN, Attorney for Appellant, Angela Bradley.

Deidre L. Monroe, Gary, IN, Attorney for Appellant, Brian Jacques.

Eugene M. Velazco Jr., Merrillville, IN, Attorney for Appellee.

## OPINION

VAIDIK, Judge.

### Case Summary

Angela B. ("Mother") and Brian J. ("Father") appeal the involuntary termination of their parental rights to their daughter, A.B., claiming the Lake County Department of Child Services ("LCDCS") failed to prove by clear and convincing evidence that continuation of both parent-child relationships pose a threat to A.B.'s well-being. Concluding that the trial court's judgment terminating Mother's and Father's parental rights to A.B. is clearly erroneous, we reverse.

### Facts and Procedural History

On September 10, 2004, Mother took her then seven-month-old daughter, A.B., to the hospital because one of the toes on her right foot had become infected and had turned black despite the use of antibiotic ointment at home. While Mother and A.B. were at the hospital, a hospital staff member contacted the LCDCS. The investigating caseworker subsequently took emergency custody of A.B. on the basis of suspected medical neglect by Mother.

On September 21, 2004, a detention hearing was held. Mother was present but was not represented by counsel. At the detention hearing, the juvenile court determined that there was probable cause to believe A.B. and her three older siblings, An.B., E.B., and R.J., were children in need of services ("CHINS"). All four children were made temporary legal wards of the State. A.B., who had been placed at Nazareth Home, was ordered to remain

physically removed from the family home. Mother, however, was permitted to retain physical custody of A.B.'s siblings because there was no evidence of neglect, medical or otherwise, toward the older children.[1] The juvenile court further ordered Mother and Father to participate in drug and alcohol evaluations, along with any resulting treatment recommendations, and parenting classes.

The LCDCS filed separate petitions alleging the children were CHINS on October 15, 2004. On December 6, 2004, the juvenile court held an initial hearing on the CHINS petition. Both parents were present, but neither parent was represented by counsel. Mother and Father both admitted to the allegations contained in the CHINS petitions. The juvenile court subsequently found the children to be CHINS and proceeded to disposition. The parents were ordered to participate in the previously recommended services.

Both parents complied with all court orders. Mother participated in parenting classes, underwent a drug evaluation, and submitted to random screens. Similarly, Father complied with the juvenile court's orders by enrolling in Apostolic Youth and Family Services, where he submitted to a drug evaluation and random drug screens, completed parenting classes, and participated in individual counseling.

Before the CHINS proceedings, Mother, Father, and the children had been living with Father's parents due to their poor economic circumstances. Approximately three weeks before the injury to A.B.'s toe,

however, Father moved out of the family home due to personal difficulties with his mother, ("Grandmother").[2] Eventually, Mother and Father decided to move the entire family out of the grandparents' home because of the escalating chaos there. The search for suitable housing, however, was unsuccessful, due to the parents' poor economic status and their ineligibility for public housing assistance. Consequently, Mother and Father made the decision to relocate to Mother's hometown of Altoona, Pennsylvania, where both Mother and Father had requested and obtained transfers from their employers and where arrangements had been made for the family to rent a home owned by Mother's uncle.

On May 2, 2005, Mother and Father attended a review hearing during which they requested that the LCDCS wardships of A.B., An.B., and R.J. be dismissed so that the family could move to Pennsylvania. The juvenile court dismissed the wardships as to A.B.'s siblings, who were still living with Mother and Father, without objection from the LCDCS. The court also ordered that the parents no longer needed to submit to drug screens. A.B., however, was not returned to Mother's and Father's care. LCDCS caseworker Judith Kelley testified that the reason she could not recommend dismissing the LCDCS's wardship of A.B. at the same time as her two older siblings, despite the fact that the parents had both successfully completed all court-ordered services and had done "basically whatever the Court had asked

---

1. At the time of the children's removal, sibling E.B. had been spending a lot of time with the Garcia family, who were good friends of Mother. Following the detention hearing, E.B. remained in the Garcias' care. The LCDCS's wardship of E.B. was dismissed on October 22, 2004. E.B. was subsequently adopted by the Garcias with Mother's and Father's permission.

2. Grandmother, who allegedly suffers from alcoholism and mental illness, would reportedly become verbally and physically abusive when not taking her medications. According to Father, his presence in the home further aggravated Grandmother's condition, so he moved in with a friend.

them to do[,]" was because "of the problems in the home ... because of the grandmom. And [A.B.'s] toe still [needed] that surgery. So we didn't want to put her in jeopardy." Tr. at 74–75.

Despite the juvenile court's refusal to return A.B. to her parents and dismiss her case, the parents proceeded to move to Altoona, Pennsylvania. A.B. remained at Nazareth Home. As a result of the family's relocation to Pennsylvania, there was no visitation between A.B. and her parents from June 2005 through March 2006.

Meanwhile, the CHINS case pertaining to A.B. progressed. Following their move to Pennsylvania, the parents missed two court hearings, one in August 2005 and one in October 2005. It was at the October 2005 hearing that the juvenile court ordered the permanency plan changed from reunification with the parents to "reunification with the parents *or* termination of parental rights and adoption." Appellant Father's App. at 15 (emphasis added).

Mother and Father thereafter attended a review and permanency hearing held on March 6, 2006. At that hearing, the juvenile court ordered all visitation between A.B. and the parents to be discontinued. The court thereafter adopted a new permanency plan that called for the termination of Mother's and Father's parental rights and the subsequent adoption of A.B. The juvenile court further ordered that A.B. be removed from Nazareth Home and placed in a pre-adoptive foster home.

Mother, upset by the court's ruling, left the hearing early. However, after the hearing concluded, Mother contacted caseworker Kelley to ask for her help in reinstating visitation. Caseworker Kelley advised Mother to petition the court for a visitation rehearing, which Mother did. Mother thereafter remained in Indiana for the next several weeks in order to attend the visitation rehearing while Father returned home to care for the other children. During this time, Mother was not permitted to visit with A.B. The juvenile court again denied Mother's request for reconsideration of visitation, and Mother eventually returned home to Pennsylvania.

Despite the juvenile court's second ruling denying the parents' request for visitation with A.B., caseworker Kelley continued to maintain contact with Mother and Father. In September 2006, caseworker Kelley initiated expedited proceedings, through an Interstate Compact Agreement[3], for a background check and home study in order to determine whether A.B. could be reunited with her parents in Pennsylvania. Mother and Father received and completed the requisite forms, obtained the necessary money orders for payment, and returned all documents to Pennsylvania authorities via U.S. mail. In October 2006, the parents received the results of their background checks, which came back "clean." Tr. at 243. When

---

3. The Interstate Compact on the Placement of Children ("ICPC"), enacted in all fifty states, provides a mechanism by which children can be sent to new *foster or adoptive* homes across state lines. *See* Ind.Code § 31–28–4–1. The ICPC includes a reporting requirement that allows a receiving state to investigate the fitness of the proposed home and to determine whether the child may be placed according to a proposed plan. *Id.* In *Bester v. Lake County Office of Family and Children*, 839 N.E.2d 143, 145 n. 2 (Ind.2005), our Supreme Court observed that no Indiana court has addressed the question of whether the ICPC applies to the interstate reunification of children with their *natural parents*. *Id.* The Supreme Court further observed that while many jurisdictions across our nation have concluded that the ICPC does apply under these circumstances, other jurisdictions have taken the contrary position. *Id.* As in *Bester*, because neither party has placed this issue before us, we save it for another day.

Mother telephoned the Pennsylvania caseworker, as he had instructed her to do, to inform him she had received the background results and was ready to proceed with the home study, she was told a home study could no longer be done because her case had been closed. Mother was further informed that the case could only be re-opened by authorities in Indiana. Mother telephoned caseworker Kelley in Indiana to ask for her assistance in re-opening the case. Caseworker Kelley agreed to help, but no study was ever conducted. The evidence is conflicting as to why the home study was never performed.

Meanwhile, A.B. was living with licensed foster parent Cynthia Cyprian. Cyprian, who was employed by the Lake County Juvenile Court as the Assistant Director of CASA, had attended the initial detention hearing in this case and had thereafter visited with A.B. at Nazareth Home as part of her official duties. Cyprian testified that she then began visiting with A.B. regularly, feeding and playing with her, and had become attached to A.B. Upon learning that A.B. had been ordered placed into a pre-adoptive home, she requested Mentor, Cyprian's private foster care placement agency, to submit her home study for consideration by LCDCS for possible placement. Mentor submitted Cyprian's home study to LCDCS, who, on December 1, 2005, placed A.B. in Cyprian's home.

The LCDCS thereafter filed a petition for the involuntary termination of Mother's and Father's parental rights. A consolidated fact-finding hearing commenced on April 23, 2007, and concluded on July 30, 2007. Mother and Father were both present and represented by counsel. At the time of the termination hearing, A.B. remained in Cyprian's care. Cyprian testified that she wished to adopt A.B. should termination of the parents' rights to A.B.

be ordered. The juvenile court took the matter under advisement and, on August 29, 2007, issued its judgment terminating both Mother's and Father's parental rights to A.B. This appeal ensued.

**Discussion and Decision**

██ We begin by noting that this Court has long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re K.S.*, 750 N.E.2d 832, 836 (Ind.Ct.App.2001). Thus, when reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 264 (Ind.Ct.App.2004), *trans. denied.* Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* In deference to the juvenile court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind.Ct.App.1999), *trans. denied.* Clear error is that which leaves us with a definite and firm conviction that a mistake has been made. *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind.Ct.App.1997).

██ Here, the juvenile court entered specific findings in terminating Mother's and Father's parental rights. Where the court has entered findings of fact, we first determine whether the evidence supports the findings. *D.D.*, 804 N.E.2d at 265. Then, we determine whether the findings support the judgment. *Id.* A finding is clearly erroneous when there are no facts or inferences drawn therefrom that support it. *Id.*

██ "The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind.

Ct.App.1996), *trans. denied.* However, because the ultimate purpose of the law is to protect the child, the parent-child relationship must give way when the parents are "unable or unwilling to meet their parental responsibilities." *K.S.*, 750 N.E.2d at 836. Although a juvenile court need not wait until a child is irreversibly influenced by a deficient lifestyle such that her physical, mental, and social growth is permanently impaired before terminating the parent-child relationship, the involuntary termination of parental rights is an extreme measure that terminates all rights of the parent to his or her child and is therefore designed to be used only as a last resort when all other reasonable efforts have failed. *In re E.S.*, 762 N.E.2d 1287, 1290 (Ind.Ct.App.2002).

In order to terminate a parent-child relationship, the State is required to allege and prove that:

(A) one (1) of the following exists:

(i) the child has been removed from the parent for at least six (6) months under a dispositional decree;

* * *

(B) there is a reasonable probability that:

(i) the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied; or

(ii) the continuation of the parent-child relationship poses a threat to the well-being of the child;

(C) termination is in the best interests of the child; and

(D) there is a satisfactory plan for the care and treatment of the child.

Ind.Code § 31–35–2–4(b)(2). The State must establish each of these allegations by clear and convincing evidence. *Egly v.*

*Blackford County Dep't of Pub. Welfare,* 592 N.E.2d 1232, 1234 (Ind.1992).

Indiana Code § 31–35–2–4(b)(2)(B) is written in the disjunctive. It therefore requires the juvenile court to find only one of the two requirements of subsection (B) by clear and convincing evidence. *See L.S.*, 717 N.E.2d at 209. Here, the juvenile court did not conclude there was a reasonable probability that the conditions resulting in removal of A.B. from the parents' care would not be remedied. Instead, the juvenile court concluded that continuation of the parent-child relationships between Mother, Father, and A.B. pose a threat to A.B.'s well-being. In so doing, the trial court made the following pertinent findings:

4) That the minor child will need additional treatment of the affected foot in the future.

5) That the minor child also has severe asthma and was not current on shots.

6) That the parents initially completed the requirements required under the original case plan but voluntarily and of their own volition moved out of state when the child was still a ward of the State of Indiana and in need of medical care.

7) That the parents did not have stable housing during the pendency of this case prior to moving out of state.

8) That the parents claim that they moved out of state due to lack of housing but there is no evidence that the parents made a concerted effort to obtain housing in this area.

9) That while the caseworker said that visitation was going well there was only one overnight visitation prior to the parents['] move to Pennsylvania.

10) That the visitation that occurred here remained supervised due to the

chaotic nature of the household in the State of Indiana.

11) That upon the parents['] move, the court ordered that there be a home study through the Interstate Compact Agreement.

12) That while two of the older children were released from wardship prior to the out[-]of[-]state move the home study was needed before the youngest child, [A.B.], was returned to the parents due to her tender age and the need for additional health care.

13) That a home study was necessary at the time of the move out[-]of[ ]state due to the then chaotic and past unstable living arrangements of the parents.

\* \* \*

16) That after the parents left the State of Indiana even though they were allowed visitation with the minor child there was no contact or requests for visitation with the minor child, who was under two (2) years of age, by the Mother, for a period of over seven (7) months (this includes no acknowledgments of the child's birthday or Christmas or inquiries into her health status).

17) That the parents made no attempts to contact the [LCDCS] during the seven (7) month absence for visitation or to complain that a home study was not conducted.

18) That the Father has not made any attempts for visitation and has not had visitation or contact with the minor child for almost two years and the child is only three (3) years old.

\* \* \*

23) That the Mother stayed in this area and attempted to appeal that ruling but her Motion to Correct Errors

was denied within a four-week period.

\* \* \*

33) There is conflicting evidence on why the study was not completed but the parents' home state of Pennsylvania closed the file due to lack of cooperation on the part of the parents.

\* \* \*

36) That the parents' lack of contact with the minor child and lack of cooperation or initiative to complete the home study casts serious doubts on their ability to care for the minor child who has serious health issues which began with Mother's failure to seek timely health care on behalf of the minor child.

\* \* \*

43) That this minor child has medical and emotional needs that the evidence shows cannot be provided by the parents in this situation.

Appellant Mother's App. at 31–34.

▮ Mother and Father argue on appeal that the LCDCS did not satisfy its burden of proving that continuation of the parent-child relationship poses a threat to A.B.'s wellbeing. Specifically, Father claims that he was not living in the family home when A.B.'s toe became infected and that there is "no evidence before the [C]ourt to suggest that [he] would not be willing to seek immediate medical treatment for his child" in the future. Br. of Appellant Father at 7. He further asserts that "no evidence was ever presented [at trial] that A.B. [would] ever [be] in any danger if she was returned to [him]." *Id.* at 4. Similarly, Mother argues that "[i]t is uncontroverted that this was an *isolated* incident[,]" and that there was no other

evidence of neglect or mistreatment observed toward A.B. or any of the other children. Br. of Appellant Mother at 10. Additionally, Mother asserts that by the time of the termination hearing, she and Father had obtained suitable housing, their two other children were progressing well in school, and that "[n]o evidence was presented that the Pennsylvania household was currently unfit for A.B." *Id.* at 11. We agree.

The record indicates that following A.B.'s removal from their care, both Mother and Father immediately complied with all court orders. Caseworker Kelley testified that during the CHINS case the parents had "regular visitations with [A.B.]" and that there had been "[n]o problems." Tr. at 60–61. Caseworker Kelley further testified that before relocating to Pennsylvania, the parents had "completed parenting classes, they participated with counseling" and had "basically [done] whatever the Court had asked them to do." *Id.* at 74. Additionally, all drug screens for both parents were negative. Moreover, when the environment at the grandparents' home became too chaotic and dangerous for the children, the parents moved to Pennsylvania where both Mother and Father had requested and obtained transfers from their employers and where arrangements had been made for the family to rent a four-bedroom home owned by Mother's uncle.

At the time of the termination hearing, Mother and Father were continuing to improve their economic and residential circumstances while living in Pennsylvania. Uncontroverted testimony reveals that, at the time of the termination hearing, Father, who has an Associate Degree, was employed at Arby's and was being considered for a promotion into a management position. Likewise, Mother had recently changed jobs in order to earn a higher salary. Mother also submitted into evidence a certificate from the children's school thanking her for volunteering 123.75 hours in the classroom.[4] In addition, the evidence shows that A.B.'s older siblings were enrolled in and succeeding academically at school. Both children also participated in the Head Start program, had medical coverage through Medicaid, and voluntarily attended summer school classes. Additionally, Mother's uncle had recently agreed to sell to the parents the house they were renting from him. Moreover, Father's father ("Grandfather"), who was retired, had divorced Grandmother, was residing in the Pennsylvania family home, and was helping to care for the children when Mother and Father were at work.

Also significant is the testimony from both Kelley and the Guardian Ad Litem ("GAL") involved in the case. Kelley confirmed that when the parents requested that the wardships of A.B., An.B., and R.J. be dismissed so that the family could move to Pennsylvania, she had no objections to the dismissal of A.B.'s siblings' cases because there had been no evidence of abuse or neglect of any of A.B.'s siblings. When questioned as to why A.B.'s case had not been dismissed at the same time as her two older siblings, Kelley responded, "[A.B.] wasn't returned during that time because, like I said, because of the problems in the home.... [B]ecause of the grandmom. And her toe still had that surgery. So we didn't want to put her in jeopardy." *Id.* at 75.

By the time of the termination hearing, however, these conditions had been remedied and thus were no threat to A.B. Uncon-

---

4. The children were involved in the Head Start program, in exchange for which parents are asked to volunteer at least 40 hours in their child's classroom each year.

troverted evidence shows that the family was no longer living with Grandmother, but was living in a four-bedroom home in Pennsylvania that had passed city inspection. Additionally, A.B.'s surgery had been postponed indefinitely, according to foster mother Cyprian, until A.B. is older and the toe "really bothers her." *Id.* at 142. Also not insignificant, the record reveals that the "Child Care Abuse History" background checks performed by the State of Pennsylvania indicated a "clean background" for both parents. *Id.* at 243; Respondent–Def. Ex. A–D, pp. 323–326. Moreover, both parents testified that they would make sure A.B. received all the medical care she needed, including any surgery she may need in the future, and that A.B.'s medical expenses would be covered by Medicaid until she turns eighteen years old. Finally, when questioned whether he "believed that [A.B.] would be in some form of danger, if she were to live with her biological mother and father[,]" GAL Jeffrey Schlesinger responded, "No." *Id.* at 224.

 Although GAL Schlesinger and caseworker Kelley both recommended termination of Mother's and Father's parental rights because they felt it was in A.B.'s best interests to be adopted by Cyprian, this alone may not serve as a basis for termination of parental rights. A parent's right to his or her children may not be terminated solely because a better place to live exists elsewhere. *See In re Miedl,* 425 N.E.2d 137, 141 (Ind.1981) (stating that "[c]hildren are not taken from the custody of their parents because there is a better or 'best' place for them"). Indiana Code § 31–35–2–4(b)(2) requires the LCDCS to prove, among other things, either (1) that there is a reasonable probability that the conditions resulting in removal of the child will not be remedied or (2) that continuation of the parent-child relationship poses a threat to the child's well-being. Neither circumstance has been proven in this case.

Simply put, the juvenile court's determination that continuation of the parent-child relationships between Mother, Father, and A.B. pose a threat to A.B.'s well-being is not supported by clear and convincing evidence. Without clear and convincing evidence to support each of the factors set forth in Indiana Code § 31–35–2–4(b)(2), we cannot affirm the termination of a parent-child relationship. Accordingly, the juvenile court's decision to terminate Mother's and Father's parental rights must be set aside.

Judgment reversed.

MAY, J., and MATHIAS, J., concur.