**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**KATHLEEN A. YOUNG**
Kokomo, Indiana

ATTORNEYS FOR APPELLEE:

**ALICIA C. CRIPE**
Indiana Department of Child Services
Kokomo, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

**FILED**

Apr 01 2013, 9:37 am

_Kevin S. Smith_

**CLERK**

of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: | ) | |
| | ) | |
| | ) | |
| | ) | |
| W.S. (Minor Child), | ) | |
| | ) | |
| AND | ) | |
| | ) | |
| B.B. (Father), | ) | |
| | ) | |
| Appellant-Respondent, | ) | |
| | ) | |
| vs. | ) | No. 34A02-1210-JT-867 |
| | ) | |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) | |
| | ) | |
| Appellee-Petitioner. | ) | |
| | ) | |

APPEAL FROM THE HOWARD CIRCUIT COURT
The Honorable Lynn Murray, Judge
Cause No. 34C01-1204-JT-118

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**VAIDIK, Judge**

## Case Summary

B.B. ("Father") appeals the termination of his parental rights to his son, W.S. Concluding that there is clear and convincing evidence to support the trial court's judgment, we affirm.

## Facts and Procedural History

Father is the biological father of W.S., born on July 17, 2011. Because W.S. tested positive for benzodiazepines at birth and showed symptoms of drug withdrawal, the local Howard County Office of the Indiana Department of Child Services ("HCDCS") was contacted. Mother admitted that she had used drugs and been in an active methamphetamine laboratory while pregnant with W.S.[1] At the time of W.S.'s birth, Father's paternity had not yet been established, and Father was incarcerated for drug-related offenses.

The HCDCS took W.S. into emergency protective custody and on July 20, 2011, filed a petition alleging that W.S. was a child in need of services ("CHINS"). Mother admitted the allegations in the CHINS petition the same day, and the trial court adjudicated W.S. a CHINS. Father was alleged to be W.S.'s biological father at that time, and court-ordered DNA testing later confirmed his paternity. However, Father took no steps to formally establish paternity at that time.

---

[1] We set forth only the facts related to Mother necessary to explain this case's progression; Mother consented to W.S.'s adoption in February 2013 and does not participate in this appeal.

A dispositional hearing was held in August 2011. Father, who was still incarcerated, did not appear. The trial court issued a dispositional order directing Mother to participate in a variety of services provided by DCS. The court also ordered DCS to offer services to Father upon his release from the DOC. A status hearing was held six months later. Father again did not appear as he was still incarcerated. Mother's sporadic participation in court-ordered services ended in early 2012 when she consented to S.W.'s adoption by his caregivers, with whom he had lived since birth.

In April 2012, the HCDCS filed a petition to terminate Father's parental rights to W.S. In May 2012, the trial court held an initial hearing on the termination petition. Father appeared telephonically and denied the allegations. The trial court granted Father's request for a continuance in June 2012. An evidentiary hearing on the termination petition was scheduled for July 16, 2012.[2] Days before the hearing, Father requested another continuance, but the trial court denied his request. On the day of the hearing, Father again requested a continuance, explaining that he was seeking a sentence modification but had not yet learned the outcome of his modification petition. The trial court also denied this request, but ordered that the record remain open until the end of August so that Father could submit additional evidence relating to his incarceration status.

During the termination hearing, the HCDCS presented evidence establishing that Father's long history of criminal behavior and substance abuse, as well as his continued incarceration, made it unlikely that he would ever be able to provide W.S. with a safe and

---

[2] At some point in the weeks before the termination hearing, Father formally established his paternity.

3

stable home environment. Specifically, the HCDCS put forth evidence that Father had misdemeanor and felony convictions for theft, check deception, and receiving stolen property. Father had also been incarcerated repeatedly for failing to pay support for his two other children. And in 2011, Father pled guilty to Class B felony dealing in methamphetamine and began serving an eight-year executed sentence.

The HCDCS also put forth evidence that S.W., who had never met Father, was thriving in his relative foster-care placement. Family Case Manager Susan Weaver testified that although there had been some "issues in the beginning with withdraw[al]s," W.S. had "overcome all the withdraw[al]s from the drugs being in his system at birth." Tr. p. 12. W.S. had bonded with his caregivers and was "progressing age[-]appropriately . . . ." *Id.* FCM Weaver testified that she did not believe there was a reasonable probability that the conditions leading to W.S.'s placement outside the home would be remedied and that continuing any parent-child relationship posed a threat to W.S., citing Father's criminal history, drug problems, and continued incarceration. *Id.* at 12-14. She recommended termination of Father's rights as being in W.S.'s best interests, explaining, "[W.S. is] very bonded to the relatives. He's made tons of progress. He's overcome the withdraw[als] . . . he deserves to have some kind of permanency." *Id.* at 13.

Court Appointed Special Advocate Georgia Peoples testified that W.S. was "in a very loving, safe, child-protected home with relatives that love him and care for him a lot." *Id.* at 22. CASA Peoples testified that she had concerns about Father's ability to care for W.S. because Father was still incarcerated and, upon Father's eventual release, he would need to "focus on getting himself to the place where he can take care of

himself" before he could take care of a child. *Id.* at 24. CASA Peoples testified that W.S. "does not deserve to be in limbo," and said that she believed termination of Father's rights was in W.S.'s best interests. *Id.*

Father also testified. He told the court that his earliest release date was June 9, 2014, but said he was seeking a modification of his sentence. *Id.* at 33. Father testified that he had been in and out of prison for the past ten years and had struggled with substance abuse during that time. Father admitted that he had "signed over" his rights to his other two children, for whom he owed more than $20,000 in child support. *Id.* at 45-46. Father also testified that he had established paternity and completed two drug-treatment programs while incarcerated. Father said he planned to live with his mother upon his release and that his family would provide him financial support. *Id.* at 40-41.

At the conclusion of the evidentiary hearing, the trial court took the matter under advisement. In mid-August, Father's petition to modify his sentence was denied. At the end of the month, the trial court entered its judgment terminating Father's rights to W.S. Father filed a motion to correct error, which was denied. He now appeals.

**Discussion and Decision**

The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010). "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty issues.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). "Indeed[,] the parent-child relationship is 'one of the most valued relationships in our culture.'" *Id.* (quoting *Neal v. DeKalb Cnty.*

*Div. of Family & Children*, 796 N.E.2d 280, 285 (Ind. 2003)). Nevertheless, parental rights are "not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights." *Id.* (citing *In re D.D.*, 804 N.E.2d 258, 264-65 (Ind. Ct. App. 2004), *trans. denied*).

When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005) (citation omitted). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Here, the trial court made specific findings and conclusions in its termination order. When a trial court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* We will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* Clear error is that which leaves us with a definite and firm conviction that a mistake has been made. *In re A.B.*, 888 N.E.2d 231, 235 (Ind. Ct. App. 2008) (citation omitted), *trans. denied*.

In Indiana, before parental rights may be involuntarily terminated, the State is required to allege and prove, among other things:

(B)　　that one (1) of the following is true:

(i)　　There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

6

> (ii)     There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii)    The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C)     that termination is in the best interests of the child; and
>
> (D)     that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).[3]  In addition, the State has the burden of pleading and proving each element of Indiana Code section 31-35-2-4(b) by "'clear and convincing evidence'" before the trial court can involuntarily terminate parental rights.  *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2).

On appeal, Father challenges only the sufficiency of the evidence supporting the trial court's judgment as to subsections (B) and (C) of the termination statute detailed above.  *See* Ind. Code § 31-35-2-4(b)(2)(B)-(C).

## I.  Conditions Remedied

Initially, we observe that Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive.  The trial court therefore had to find only that one of the three requirements of subsection 2(B) had been met before terminating Father's parental rights.  *See In re L.V.N.*, 799 N.E.2d 63, 69 (Ind. Ct. App. 2003).  Nevertheless, the trial court found sufficient evidence had been presented to satisfy the evidentiary requirements of subsections 2(B)(i) and 2B(ii).  Because we find it to be dispositive in this context, we

---

[3]  Indiana Code section 31-35-2-4 was amended by Pub. L. No. 48-2012 (eff. July 1, 2012).  The changes to the statute became effective after the filing of the termination petition in this case and are therefore not applicable here.

7

shall only consider whether clear and convincing evidence supports the trial court's finding as to subsection 2(B)(i) of the termination statute.

In making such a determination, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re I.A.*, 903 N.E.2d 146, 154 (Ind. Ct. App. 2009) (citations omitted). The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child. *Id.* Similarly, courts may consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.* The trial court may also consider the services offered to the parent and the parent's response to those services, as evidence of whether conditions will be remedied. *Id.* Finally, DCS is not required to provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *Id.*

Here, in determining that there was a reasonable probability that the reasons for W.S.'s placement outside Father's care will not be remedied, the trial court set forth the evidence regarding Father's inability to provide W.S. with a safe and stable home environment. Specifically, Father testified about his history of substance abuse and criminal behavior, which spanned more than a decade. Father admitted that he had been incarcerated for failing to provide financial support for his other two children. Father also admitted that his scheduled release date was two years away. FCM Weaver and CASA Peoples expressed concern about Father's ability to care for W.S. and

8

recommended termination, explaining that W.S. was thriving in his current home, was bonded to his caregivers, and deserved permanency.

Although Mother was W.S.'s sole caretaker when he was initially taken into protective custody, the HCDCS was unable to place W.S. with Father due to Father's incarceration. At the time of the termination hearing, Father was still unable to provide D.L. with the necessities of life, including food, clothing, or a safe and stable home, due to his continuing incarceration. Notwithstanding his inability to care for W.S. at the time of the termination hearing, Father claims he should have the chance to parent W.S. because he "did all the programs available at [the DOC] to remedy his problems," and had filed a petition to modify his sentence. Appellant's Br. p. 10.[4] While Father's efforts are steps in the right direction, they are outweighed by his history of criminal conduct and substance abuse, which led to his continued incarceration in the ten years before W.S.'s birth, and in the years after.[5] And although Father's sentence-modification petition was pending at the time of the termination hearing, a trial court must judge a parent's fitness to care for his or her children at the time of the termination hearing. *I.A.*, 903 N.E.2d at 154.

Based on the foregoing, we conclude that the trial court's determination that there is a reasonable probability the conditions resulting in W.S.'s removal and continued

---

[4] Father notes that he received "no services from DCS," but makes no argument on appeal that his due-process rights were violated. *See* Appellant's Br. p. 8, 12.

[5] In noting his efforts, Father cites the case of *Rowlett v. Vanderburgh County Office of Family & Children*, 841 N.E.2d 615, 622 (Ind. Ct. App. 2006). But the father in *Rowlett*, who was scheduled to be released from prison six weeks after the termination hearing, had completed "nearly 1,100 hours of individual and group services, including services in encounters, anger management and impulse control, parenting skills, domestic violence, self-esteem, self-help, and substance abuse." *Id.* Father's efforts in this case are not comparable to the father's in *Rowlett*.

placement outside Father's care will not be remedied is supported by clear and convincing evidence. *See Castro v. State Office of Family & Children*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006) (concluding that trial court did not commit clear error in finding conditions leading to child's removal from father would not be remedied where father, who had been incarcerated throughout CHINS and termination proceedings, was not expected to be released until after termination hearing), *trans. denied.* At the time of the termination hearing, Father was unable to care for W.S., and those involved in the case expressed concern about his ability to do so in the future given his criminal and substance-abuse history. Therefore, we cannot say that the trial court committed clear error when it found that there is a reasonable probability that the conditions leading to W.S.'s removal will not be remedied.

## II. Best Interests

We next consider Father's assertion that the HCDCS failed to prove that termination of his parental rights is in W.S.'s best interests. In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the DCS and look to the totality of the evidence. *I.A.*, 903 N.E.2d at 155 (citing *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003)). In so doing, the trial court must subordinate the interests of the parent to those of the child. *Id.* A trial court need not wait until a child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.* at 199. In addition, we have previously held that the recommendations of the case manager and child advocate to terminate parental rights, in

10

addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *Id.* (citations omitted).

Further, a parent's historical inability to provide adequate housing, stability, and supervision, coupled with a current inability to provide the same will support a finding that termination of the parent-child relationship is in the child's best interests. *Castro*, 842 N.E.2d at 374-75 (citing *In re A.L.H.*, 774 N.E.2d 896, 900 (Ind. Ct. App. 2002), *trans. denied.*). In other words, "[a]lthough parental rights have a constitutional dimension, the law allows for their termination when parties are *unable* or unwilling to meet their responsibility as parents." *Id.* (citing *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004)). Because he has been incarcerated since before W.S.'s birth, Father has an historical inability to provide adequate housing, stability, and supervision for his son. And Father's continued incarceration at the time of the termination hearing is evidence of his current inability to provide the same.

A number of other factors also weigh in favor of the trial court's conclusion that termination of Father's parental rights is in W.S.'s best interests: (1) W.S. is in need of and deserving of permanency; (2) W.S. is thriving in his current placement; (3) FCM Weaver and CASA Peoples recommended termination as in W.S.'s best interests; and (4) there is no guarantee that Father will be a suitable parent once he is released or that he would even obtain custody. *See Castro*, 842 N.E.2d at 374; *see also S.P.H.*, 806 N.E.2d at 883 (finding "the needs of the children to be too substantial to force them to wait while determining if [their father] would be able to be a parent for them."). As to W.S.'s best

interests, Father argues again that he "made great strides to improve his life and thereby his ability to care for his child." Appellant's Br. p. 11. But the totality of the evidence shows that these "great strides" are dwarfed by Father's criminal and substance-abuse history, and more importantly, W.S.'s need for stability and permanency. We cannot say that the trial court erred in determining that termination of the parent-child relationship was appropriate in this case.

This Court will reverse a termination of parental rights only upon a showing of clear error—"that which leaves us with a definite and firm conviction that a mistake has been made." *A.B.*, 888 N.E.2d at 235 (quotation omitted). We find no such error here.

Affirmed.

KIRSCH, J., and PYLE, J., concur.