**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**DEIDRE L. MONROE**
Lake Public Defender's Office
Gary, Indiana

ATTORNEYS FOR APPELLEE:

**EUGENE M. BELAZCO, JR.**
DCS Lake County Office
Gary, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

**DONALD W. WRUCK**
Wruck Paupore PC
Lake County Court Appointed
Special Advocate
Dyer, Indiana

**FILED**

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE
TERMINATION OF THE PARENT-CHILD
RELATIONSHIP OF:

E.M. & El.M (Minor Children),

  And

E.M. (Father),

  Appellant-Respondent,

    vs.

THE INDIANA DEPARTMENT OF
CHILD SERVICES,

  Appellee-Petitioner.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 45A03-1208-JT-370

**May 8, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**VAIDIK, Judge**

## Case Summary

E.M. ("Father") appeals the termination of his parental rights to his son, E.M., and daughter, El.M. Because we conclude that there is insufficient evidence to support the trial court's judgment, we reverse.

## Facts and Procedural History

Father is the biological father of E.M., born on December 23, 2007, and El.M., born on December 2, 2008. In the fall of 2008, the local Lake County Office of the Indiana Department of Child Services ("LCDCS") received a report of domestic violence between Father and E.M.'s mother ("Mother").[1] At this time El.M. had not yet been born. Mother and Father have never been married; Father has been married to another woman, Y.M., since the late '90s.

When LCDCS employees arrived at the home, Mother denied that any domestic violence had occurred. However, Mother's older children by another man reported that Father hit Mother, and Mother eventually admitted this. Officers from the Gary Police Department located Father and arrested him. Police also informed the LCDCS that they

---

[1] Mother does not participate in this appeal; thus, we set forth the facts relevant to Father's appeal only.

2

had responded to several domestic-violence calls regarding Father and Mother in the past, but that Mother had routinely refused to press charges against Father. The LCDCS allowed the children to remain in the home with Mother on the condition that Father stay away from the home and not contact Mother or the children.

In October 2008, the LCDCS filed a petition alleging that E.M was a child in need of services ("CHINS"). After a fact-finding hearing one month later, the trial court adjudicated E.M. a CHINS. The LCDCS filed a CHINS petition as to El.M. a short time after her birth, and she was also adjudicated a CHINS. Mother and Father were ordered to participate in a variety of services provided by DCS to facilitate reunification with their children. Father, specifically, was ordered to establish paternity for both children and complete domestic-violence counseling, anger-management and parenting classes, and home-based services. Tr. p. 61, 75. Father was also ordered to participate in supervised parenting time, undergo a psychological evaluation, and stay away from the home where Mother and the children were living.

Some time later, the LCDCS received a report that Father, contrary to court order, had been at the home with Mother and the children. The report was confirmed by Mother's older children. The LCDCS removed all of the children from the home in March 2009. The children were placed at Saint Joseph's Carmelite Home, an emergency shelter and residential treatment center for families and children in East Chicago.

Father initially refused to participate in court-ordered services. He told DCS employees that he had no problems and was never violent with Mother. He was hostile toward the family's case manager, Tina Kozlowski, and called her derogatory names.

3

Eventually, Father attended two domestic-violence counseling sessions, but he did not complete the counseling. Father paid one visit to E.M. and El.M. at Carmelite House, but he did not see the children again after that visit.[2] In September 2009, he was incarcerated in Illinois for armed robbery.

In February 2011, the trial court held a status hearing and modified the children's permanency plans from reunification to adoption. The LCDCS also filed petitions to terminate Mother and Father's parental rights. The termination hearing was scheduled for July 2012.

Father was released from prison in January 2012. Upon his release, he contacted the LCDCS and asked to see E.M. and El.M. Dwaine Terry ("FCM Terry"), the family case manager newly assigned to the case, told Father he could not see the children because he had not been compliant with the case plan. At that point, Father began to participate in services. He submitted to a psychological evaluation, which recommended additional anger-management and domestic-violence counseling. Father participated in these recommended classes and counseling. Father also completed the court-ordered parenting classes in May 2012.

One month later, the termination hearing was held. At the hearing, the LCDCS acknowledged Father's recent participation in services. However, FCM Terry testified that Father's participation in services was too little, too late. FCM Terry said that Father had the opportunity to complete services before he was incarcerated, but he refused to do so. He also explained that Father had only visited E.M. and El.M. one time at Carmelite

---

[2] Father maintains that he visited the children weekly at Carmelite House. However, we must view the evidence in the light most favorable to the judgment. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005).

House, and now, more than two years had passed since Father had seen the children. *Id.* at 95.[3] FCM Terry also testified that upon his release from prison, Father contacted him and asked to see the children. FCM Terry said that he denied Father's request and told him he needed to comply with the court-ordered services. *Id.* at 111. FCM Terry went on to testify that there had been "too long of . . . a time period of [no] contact with these children." *Id.* at 102. FCM Terry expressed concern about the children's stability, saying, "We can't keep starting them over." *Id.* at 100, 102. FCM Terry testified that E.M. and El.M. were thriving in their relative placement with their maternal grandmother, who wished to adopt them. He recommended terminating Father's rights.[4]

Thomas Lemke, a therapist at Carmelite House, testified about Mother's older children with another man. Mr. Lemke testified that Mother's older children had witnessed violence between Mother and Father, as well as Father threatening Mother, and were afraid of Father as a result. However, Mr. Lemke admitted that he had only worked with the older children—not Father's children—and could not testify about Father's relationship with his children or his parenting skills. *Id.* at 138-39. The biological grandmother of Father's children also testified. She confirmed the older children's fears of Father but said Father's children were "too young" to fear him. *Id.* at 154. She said E.M. and El.M. were doing well and she hoped to adopt them.

---

[3] FCM Terry testified that Father had phone contact with the children, but it is not clear when this occurred. *See* Tr. p. 119-20.

[4] Whether or not paternity was established is not apparent from the record and was not included in the trial court's findings. FCM Terry testified that Father's name was on the children's birth certificates, but he also testified that he had no record of paternity being formally established.

Father also testified. He said that his relationship with Mother had ended after his arrest in 2008. *Id.* at 177. He told the court that he had completed one parenting class while incarcerated and a second since being released, and he submitted a parenting-class certificate. *Id.* at 189; Respondent's Ex. 2. Father also said that while incarcerated he had completed an anger-management class and was currently in a second anger-management class, with one or two meetings left until completion. Tr. p. 189-90. He admitted that he had anger issues which caused him to get "upset . . . beyond [] necessity," and that he overreacted when he felt attacked. *Id.* at 190. He told the court that he had obtained his commercial truck-driver's certification and submitted the accompanying certificate. Father said he could provide support and a home for the children. Respondent's Ex. 1. He testified that he was parenting his two children with his wife, Y.M., and that they were happy and successful. *Id.* at 199. He also testified that he had helped raise Y.M.'s two other children by another man. *Id.* Y.M. confirmed this and testified that she was willing to help Father raise E.M. and El.M. *Id.* at 211-13.

At the conclusion of the evidentiary hearing, the trial court took the matter under advisement. Two weeks later, the trial court entered its judgment terminating Mother and Father's rights to E.M. and El.M. Father now appeals.

**Discussion and Decision**

The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010). "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty issues.'" *Id.* (quoting

6

*Troxel v. Granville*, 530 U.S. 57, 65 (2000)). "Indeed[,] the parent-child relationship is 'one of the most valued relationships in our culture.'" *Id.* (quoting *Neal v. DeKalb Cnty. Div. of Family & Children*, 796 N.E.2d 280, 285 (Ind. 2003)). Nevertheless, parental rights are "not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights." *Id.* (citing *In re D.D.*, 804 N.E.2d 258, 264-65 (Ind. Ct. App. 2004), *trans. denied*).

When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005) (citation omitted). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Here, the trial court made specific findings and conclusions in its termination order. When a trial court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* We will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* Clear error is that which leaves us with a definite and firm conviction that a mistake has been made. *In re A.B.*, 888 N.E.2d 231, 235 (Ind. Ct. App. 2008) (citation omitted), *trans. denied*.

In Indiana, before parental rights may be involuntarily terminated, the State is required to allege and prove, among other things:

(B)    that one (1) of the following is true:

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).[5] In addition, the State has the burden of pleading and proving each element of Indiana Code section 31-35-2-4(b) by "'clear and convincing evidence'" before the trial court can involuntarily terminate parental rights. *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2).

On appeal, Father challenges the sufficiency of the evidence supporting the trial court's judgment as to subsections (B), (C), and (D) of the termination statute detailed above. *See* Ind. Code § 31-35-2-4(b)(2)(B)-(D). Because we find it to be dispositive, we limit our discussion to Father's allegations of error pertaining to subsection (b)(2)(B) of the termination statute.

### I. Conditions Remedied and Threat to Well-Being

Initially, we observe that Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive. The trial court therefore had to find only that one of the three requirements of subsection 2(B) had been met before terminating Father's parental

---

[5] Indiana Code section 31-35-2-4 was amended by Pub. L. No. 48-2012 (eff. July 1, 2012). The changes to the statute became effective after the filing of the termination petition in this case and are therefore not applicable here.

rights.  *See In re L.V.N.*, 799 N.E.2d 63, 69 (Ind. Ct. App. 2003).  Nevertheless, the trial court found sufficient evidence had been presented to satisfy the evidentiary requirements of subsections 2(B)(i) and 2(B)(ii).

A trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions.  *In re I.A.*, 903 N.E.2d 146, 154 (Ind. Ct. App. 2009) (citations omitted).  The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child.  *Id.*  Similarly, courts may consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment.  *Id.*  The trial court may also consider the services offered to the parent and the parent's response to those services, as evidence of whether conditions will be remedied.  *Id.*

The purpose of terminating parental rights is not to punish the parent but to protect the children involved.  *In re D.B.*, 942 N.E.2d 867, 872 (Ind. Ct. App. 2011) (citing *In re K.S.*, 750 N.E.2d 832 (Ind. Ct. App. 2001)).  The involuntary termination of parental rights is the most extreme sanction a court can impose on a parent because termination severs all of a parent's rights to his or her children.  *Id.* (citing *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008)).  "Termination of parental rights is therefore intended as a last resort, available only when all other reasonable efforts have failed."  *Id.*

9

Here, in determining that there was a reasonable probability that the reasons for the children's placement outside Father's care will not be remedied, the trial court made the following finding:

> [Father] denied all services offered. [Father] refused to comply with any of the service providers. [Father] only visited his children one time. All services ceased for [Father] due to his non-compliance and lack of contact. [Father] was eventually incarcerated in [] Illinois for burglary and armed robbery. [Father] was released in January of 2012. [Father] continues to deny that he has issues with domestic violence. Father has not completed any counseling or therapy. [Father] has not seen his children in over two years. Even though [Father] has recently attempted to comply with the case plan, he [] had ample opportunity before his incarceration to comply, which he refused. The children cannot wait three years for a parent to comply.

Appellant's App. p. 2-3. In further determining that there was a reasonable probability that the continuation of the parent-child relationship posed a threat to the children, the trial court stated, "for the reasons set forth above. Additionally, the children deserve a loving, caring, safe, and stable home." *Id.* at 3.

The trial court's finding emphasizes Father's past conduct and minimizes his recent progress and efforts at the time of the termination hearing. The record indeed reveals that Father was largely non-compliant and completed only two domestic-violence counseling sessions before his incarceration in Illinois. But the record also reveals that Father participated in an anger-management class and a parenting class while incarcerated. And upon his release, Father contacted FCM Terry about seeing the children. FCM Terry told Father he could not see the children because he had not completed the necessary court-ordered services. Father submitted to a psychological evaluation, which recommended additional services. He enrolled in another parenting class, which he completed. He began participating in anger-management counseling, and

10

at the time of the termination hearing, had only one or two more counseling sessions to go until completion. And although the trial court found that Father continues to deny that he has issues with domestic violence, at the termination hearing Father admitted he had anger problems and had overreacted in his dealings with Mother. Father also submitted evidence of employment.

Therefore, the record reveals that *at the time of the termination hearing*, Father had been compliant and engaged in court-ordered services. We acknowledge that before his incarceration, Father made little to no progress in complying with his court-ordered services and did not take advantage of his ability to exercise parenting time. But at the time of the termination hearing, this had changed. A parent's historical conduct is relevant in a trial court's determination, but a trial court must judge a parent's fitness to care for his child at the time of the termination hearing, taking into consideration evidence of changed conditions. *I.A.*, 903 N.E.2d at 154. At the time of the termination hearing, Father showed significant progress and compliance with the case plan. For this reason, we conclude that DCS failed to meet its statutory burden of proving that the conditions that resulted in the children's removal will not be remedied and that the continuation of the parent-child relationship posed a threat to the children.

This is not to say that Father has reached the end of his journey with DCS or that he is ready to parent E.M. and El.M., who currently do not know their father. It is likely that additional services can further improve Father's ability to parent E.M. and El.M. and resolve any lingering domestic violence or anger-management concerns. The LCDCS will need to determine what, if any, additional services are necessary. Further, we are

11

acutely aware of the fact that E.M. and El.M. are living and thriving in a home with a relative who wishes to adopt them. However, a parent's constitutional right to raise his own child may not be terminated solely because there is a potentially better home available for the child. *D.B.*, 942 N.E.2d at 875 (citing *K.S.*, 750 N.E.2d at 836). And we acknowledge that reversals in termination cases may cause disruptions in a child's life. However, DCS bore the burden of proving that termination was warranted here, and it failed to do so. Therefore, we reverse and remand for further proceedings.

Reversed.

PYLE, J., concurs.

KIRSCH, J., dissents without opinion.