## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 11 2017, 6:52 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Leanna Weissmann
Lawrenceburg, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re: Termination of the Parent-Child Relationship of:

J.C., K.C., and I.W., (Children)

and,

C.W., (Mother)

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

May 11, 2017

Court of Appeals Case No.
16A01-1612-JT-2787

Appeal from the Decatur Circuit Court

The Honorable Timothy Day, Judge

Trial Court Cause No.
16C01-1603-JT-108
16C01-1603-JT-109
16C01-1603-JT-110



*Appellee-Petitioner.*

**Barnes, Judge.**

# Case Summary

C.W. ("Mother") appeals the termination of her parental rights to her children J.C., K.C., and I.W. We affirm.

# Issue

The sole issue is whether there is sufficient evidence to support the termination of Mother's parental rights.

# Facts

J.C. was born in 2002, K.C. in 2003, and I.W. in 2006. In July 2012, the Decatur County Office of the Department of Child Services ("DCS") received a report that Mother and the children had been living in a vacant shed in a trailer park. The children were being fed by neighbors because they had no food, and they ran around the trailer park at all hours without supervision. The children told DCS caseworkers that they had been staying with J.C., their father ("Father"); at the time, Father had a protective order against him for

threatening to kill the children. The children also reported witnessing Mother and Father crushing pills and snorting them. The children were removed from Mother's care and found to be children in need of services ("CHINS") shortly thereafter. They remained in foster care continuously since that time.

[4] Mother had a fourth child, F.W., who was born in March 2013, and who also was found to be a CHINS a few months after birth. DCS filed a petition to terminate Mother's rights to F.W., which was granted in January 2015 and affirmed by this court. We observed:

> During the CHINS proceedings, Mother barely maintained contact with her family case manager; she has not maintained suitable or stable housing; she has not consistently visited with Child; she did not follow through on recommended individual therapy, including additional substance abuse evaluation; she refused all but three drug screens; and she failed two out of the three drug screens. In short, Mother has been more non-compliant with the court's orders than compliant.

*In re F.W.*, No. 16A01-1506-JT-766 (Ind. Ct. App. Dec. 22, 2015).

[5] The evidence with respect to J.C., K.C., and I.W. is similar. Mother apparently did participate in DCS services while she was pregnant with F.W. and remained sober for a few months. Once she gave birth to F.W., however, her stability decreased. She became homeless in May 2013, had positive drug screens for THC, and stopped participating in services. In June 2013, DCS shared the results of a psychological examination with Mother and requested that she begin receiving mental health services, but she did not follow through

on that request. Mother suffers from delusions and has a volatile temper. In October 2013, DCS suspended Mother's supervised visitation with the children because it was too traumatic for them. Specifically, she frequently missed scheduled visitations. When visitations did occur, Mother often became upset and blamed the children, especially J.C., for the family being involved with DCS, causing the children to feel guilty. She also told the children delusional untruths about being able to get a house soon, falsely getting their hopes up that things were improving. During one visitation, Mother became so angry that the visitation supervisor ended the visit, but Mother attempted to grab F.W. out of his arms and chased his car down the street as he drove away with the children. Visitation never was restored with J.C., K.C., and I.W.

[6] Mother had no communication with her DCS case manager between June 2013 and October 2014, when a new case manager located her living with Father. Mother underwent a drug screen in October 2014, which was negative, one in November 2014 that was positive for marijuana, and one in December 2014 that was positive for marijuana and unprescribed oxycodone. After the last drug screen, Mother became confrontational and refused to participate in any more screens until she could see the children, to which DCS did not agree. Shortly thereafter, Mother called her caseworker and said she wanted to voluntarily terminate her parental rights because of her and the children's mental health, but she later changed her mind. Between October 2014 and April 2015, the caseworker repeatedly attempted to persuade Mother to participate in services such as mental health counseling, but Mother did not do

so. She claimed she was independently receiving mental health treatment from another facility, but DCS was unable to confirm this.

[7] The last contact Mother had with DCS was in April 2015. DCS was unable to locate her thereafter, despite employing an investigator to help look for her. DCS received information that Mother had moved to Florida, but it was unable to confirm or deny those reports.

[8] The children have had mental health struggles of their own for which they were receiving services through DCS. J.C. has attempted suicide several times, has spent considerable time in a residential facility, and displays problems with impulse control, aggressiveness, and inappropriate sexual behaviors. I.W. also has had suicidal ideations, as well as aggressiveness and lack of impulse control. K.C. has engaged in self-harm and spent a short period in a residential facility due to suicidal ideations. K.C. in particular tended to idealize Mother; she also "doesn't like stability" and was not concerned about having been frequently homeless while in Mother's care. Tr. p. 59. K.C. also expressed that she did not want to be adopted, which seemed to be based in part on Mother making negative comments to her about adoption. The children's progress in mental health treatment has been inconsistent.

[9] On March 18, 2016, DCS filed a petition to terminate the parental rights of Mother and Father to J.C., K.C., and I.W. Father subsequently consented to the termination of his parental rights. The trial court held a hearing on the petition on September 12, 2016; Mother did not appear, after DCS was

compelled to provide notice of the hearing by publication only. The current DCS caseworker and the children's court-appointed special advocate both testified the termination of Mother's parental rights was in the children's best interests, so they could be adopted. Although none of the children were in a pre-adoptive home at the time of the hearing, the caseworker explained that there are more opportunities to find adoptive homes for children after parental rights have been terminated. After the hearing, the trial court orally ordered termination of Mother's parental rights, which was subsequently reduced to written findings and conclusions. Mother now appeals.

# Analysis

[10] Mother challenges the sufficiency of the evidence supporting termination of her parental rights. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010). "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054 (2000)). "Indeed the parent-child relationship is 'one of the most valued relationships in our culture.'" *Id.* (quoting *Neal v. DeKalb County Div. of Family & Children*, 796 N.E.2d 280, 285 (Ind. 2003)). We recognize, of course, that parental interests are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* Thus, "'[p]arental rights may be terminated when

the parents are unable or unwilling to meet their parental responsibilities.'" *Id.* (quoting *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*).

[11] When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *Id.* We consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* We must also give "due regard" to the trial court's unique opportunity to judge the credibility of the witnesses. *Id.* (quoting Ind. Trial Rule 52(A)). Here, the trial court entered findings of fact and conclusions thereon in granting DCS's petition to terminate Mother's parental rights. When reviewing findings of fact and conclusions thereon entered in a case involving a termination of parental rights, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

[12] Indiana Code Section 31-35-2-8(a) provides that "if the court finds that the allegations in a petition described in [Indiana Code Section 31-35-2-4] are true, the court shall terminate the parent-child relationship." Indiana Code Section 31-35-2-4(b)(2) provides that a petition to terminate a parent-child relationship involving a child in need of services must allege, in part:

> (B)    that one (1) of the following is true:

(i)     There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii)   The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C)     that termination is in the best interests of the child; and

(D)     that there is a satisfactory plan for the care and treatment of the child.

DCS must establish these allegations by clear and convincing evidence. *Egly v. Blackford County Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1234 (Ind. 1992).

[13]    Mother's sole argument is that there is insufficient evidence termination is in the children's best interests. She relies upon *In re A.B.*, 888 N.E.2d 231 (Ind. Ct. App. 2008), *trans. denied*, in which this court reversed a termination of parental rights based solely on the recommendation of the guardian ad litem and DCS caseworker that it was in the child's best interests to be adopted by her foster mother. We observed, "A parent's right to his or her children may not be terminated solely because a better place to live exists elsewhere." *A.B.*, 888 N.E.2d at 239. In that case, the child was removed from the parents based on one incident of possible medical neglect, but the parents thereafter complied

with all court orders and DCS services, always had negative drugs screens and regular non-problematic visitation, and the parents were improving their economic and residential circumstances.

[14] Here, by contrast, Mother was almost entirely non-compliant with services for over three years prior to the termination hearing, despite a clear need for such services. Her visitation was permanently suspended in October 2013 because it was too emotionally traumatic for the children, due to Mother's erratic behavior. Two of the only three drugs screens Mother consented to were positive for illicit substances. There was no improvement in Mother's economic or residential circumstances, continuing a long-standing pattern of instability and/or homelessness. In fact, Mother's whereabouts for the nearly one-and-a-half years before the termination hearing were unknown. This case bears little similarity to *A.B.*

[15] In determining the best interests of a child, courts must look beyond the factors identified by DCS and consider the totality of the evidence. *In re A.S.*, 17 N.E.3d 994, 1005 (Ind. Ct. App. 2014), *trans. denied*. The interests of the parent must be subordinated to those of the child. *Id.* "The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship." *Id.* Testimony by caseworkers and court-appointed advocates recommending termination, combined with evidence that the conditions resulting in a child's removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *Id.* "Permanency is a

central consideration in determining the best interests of a child." *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009).

[16] Mother does not dispute that there is sufficient evidence the conditions leading to the children's removal from her care will not be remedied. Indeed, the evidence on that point is overwhelming, given Mother's continued instability and failure to participate in any services for years. Both the current DCS caseworker and the CASA opined that it was best for the children if Mother's parental rights were terminated so they could have a better chance at adoption and permanency. This is sufficient evidence that termination was in the children's best interests.

[17] We acknowledge Mother's argument that K.C. expressed a desire not to be adopted and that she preferred instability over stability. She suggests it will be difficult to find adoptive homes for the children and, therefore, it would not be harmful to continue their placement in foster care indefinitely. As for K.C.'s comments, they are a sad reflection of her early, unstable upbringing and a continuing desire to please Mother. A teenager's stated preference for instability after a difficult early childhood caused by his or her parents should not be a deciding factor in a termination of parental rights case. And, even if it does prove difficult to find permanent adoptive homes for the children, their chances for adoption are improved following termination of Mother's parental rights. In sum, there is clear and convincing evidence that termination of Mother's parental rights is in the children's best interests.

# Conclusion

There is sufficient evidence to support the termination of Mother's parental rights. We affirm.

Affirmed.

Baker, J., and Crone, J., concur.