RUCKER, J.,
dissenting.
In a carefully worded and well reasoned memorandum decision the Court of Appeals concluded there was insufficient evidence to support the trial court’s judgment terminating Father’s parental rights. In re E.M., No. 45A03-1208-JT-370, 2013 WL 1919525 (Ind.Ct.App. May 8, 2013). It therefore reversed the judgment of the trial court. I agree with the Court of Appeals and thus respectfully dissent from the majority’s contrary view.
The parent-child relationship is “one of the most valued relationships in our culture.” Neal v. DeKalb Cnty. Div. of Family & Children, 796 N.E.2d 280, 285 (Ind.2003) (quotation omitted). And a parent’s interest in the upbringing of his or her child is “perhaps the oldest of the fundamental liberty interests recognized by th[e] [e]ourt[s].” Troxel v. Granville, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (plurality op.). It is thus not surprising that the United States Supreme Court has declared that before a State may completely and irrevocably sever a parent’s parental rights, the State must at a minimum support its allegations by “clear and convincing” evidence. The Court has elaborated:
When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it. “If the State prevails, it will have worked a unique kind of deprivation.... A parent’s interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore, a commanding one.”
Santosky v. Kramer, 455 U.S. 745, 759, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (quoting Lassiter v. Dep’t of Social Servs. of Durham Cnty., 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981)). Indeed, the issue extends beyond the parent’s rights, but also includes the rights of the child to his or her family. See Karen A. Wyle, Fundamental Versus Deferential: Appellate Review of Terminations of Parental Rights, 86 Ind. L.J. Supp. 29, 35 (2011). “[T]he child and his parents share a vital interest in preventing erroneous termination of their natural relationship.” Id. at 35-36 (quoting Santosky, 455 U.S. at 760, 102 S.Ct. 1388). “While the State and the child share an obvious interest in protecting the child’s welfare and safety, ‘the State registers no gain towards its declared goals when it separates children from the custody of fit parents.’ ” Id. at 36 (quoting Stanley v. Illinois, 405 U.S. 645, 652, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)).
As the majority recognizes, we review the trial court’s termination order to determine whether the evidence clearly and convincingly supports the trial court’s findings and whether the findings clearly and convincingly support the judgment of termination. See op. at 642 (citing K.T.K. v. Ind. Dep’t of Child Sens., 989 N.E.2d 1225, 1230 (Ind.2013) (quotation omitted)). I agree this standard is “not a license to reweigh the evidence,” id., but rather implements our appellate authority to reverse in the presence of clear error. See Tr. Rule 52(A). But, in following the Supreme Court’s admonition to apply a heightened standard of proof in termination cases, we must be mindful that “a standard of proof loses much of its value if a reviewing court does not apply sufficient scrutiny to enforce it.” Wyle, supra at 37.
Involving a mother, four fathers, and seven children, this case represents the efforts of one inner-city Father, attempting to “step up to the plate” and take responsibility for raising his children. In *651 terminating Father’s parental rights the trial court relied on several findings that were unsupported by any evidence whatsoever. Among the critical erroneous trial court findings were that “the children ... were being abused in the home.” Termination Order at 2.
In point of fact, there is absolutely no evidence in the record that E.M. and E1.M. were ever abused. Relying on literature standing for the general proposition that young children may be affected by exposure to domestic violence, the majority concludes “it was reasonable under the circumstances to find that Father’s violence towards Mother had also ‘abused’ E.M. and E1.M.” Op. at 644. The majority seems to equate exposure to violence as “abuse” apparently reasoning that if a child is so exposed then the child is affected by the exposure and thus abused. Even accepting such a proposition, there is simply nothing in this record upon which the trial court could find that either E.M. or E1.M. “were being abused in the home.” First, there is nothing in this record supporting the notion that E.M. or ELM. ever observed the violence that occurred between Father and Mother. The case worker testified the “children had reported seeing” Father hit Mother on more than one occasion. Tr. at 60. But there were six children in the home at the time, with E.M. being the youngest. (ELM. was not even born at the time). And as the caseworker explained she only interviewed “[t]he older children.” Tr. at 57. More to the point, although the record shows that two of the older half-siblings were diagnosed with psychiatric disorders, the same was not true with respect to E.M. or E1.M. The following testimony from the children’s caseworker at the May 2011 termination hearing goes to the heart of the matter:
Q. [A]s it relates to what the children are doing at this point, [E.M.] and [El. M.], have they been diagnosed with any type of issues?
A. No.
Q. So they are doing, uh, physically and mentally fine?
A. Correct.
Tr. at 116. And although the therapist at the Carmelite Home where the children were placed from March 2009 to March 2011 found it necessary to provide therapy for the “older boys,” Tr. at 124, the therapist testified, “[n]o, I haven’t” to the question “as it relates to [E.M and ELM.] have you had any relationship with them?” Tr. at 139. The inference if any that may be drawn from the testimony of the therapist is that had either E.M. or E1.M. exhibited any signs whatsoever of “psychological harm,” op. at 645, then the therapist would have provided appropriate intervention. Further, the Case Manager’s progress report dated April 16, 2010 reveals “[E.M.] is a two year old African American male child who appears healthy and is age appropriately active. [ELM.] is a one year old African American female child. [E1.M.] appears healthy and active_ There have been no reported behavioral problems with [E.M.] or [El.M.].” CHINS Progress Report, Apr. 16, 2010 at 2, 3. Similar observations were made in the progress reports dated January 7, 2011[1] and May 17, 2012.[2] Thus, on the record *652 before us the majority’s observation that “even in the earliest phases of infant and toddler development, clear associations have been found between exposure to violence and post-traumatic symptoms and disorders,” op. at 644 (quotation omitted), is simply not applicable to' E.M. and E1.M. Absent any evidence that E.M. or El.M. were exposed to domestic violence and if exposed were affected by it, the trial court was not permitted to infer that Father abused his children. The trial court’s finding of abuse is unsupported by any evidence at all and was thus clearly erroneous.
The trial court also found that Father “denied all services offered.” Termination Order at 2. This too is unsupported by the evidence. One such service involved psychological counseling. The majority says that this finding read in context with another finding actually means that the trial court was referring to “Father’s pre-incar-ceration refusal of services.... ” Op. at 645 (emphasis in original). But a Case Manager’s Progress Report dated July 31, 2009 — two months before Father was incarcerated — reveals: “[Father] (E.M. and El.M.’s father) has made sporadic visits with his children. [Father] did provide an evaluation recently, but earlier declined anger management services when the children were removed from the home.” CHINS Progress Report, July 31, 2009 at 4. The report is consistent with the Case Manager’s testimony that “[t]here was a[ ] [psychological] evaluation completed for [Father].” Tr. at 89. It is clear that Father did engage in some services, though his participation was reluctant and less than satisfactory. And if, as the majority contends, the trial court was referring to an earlier point in time then the evidence does not support the trial court’s finding. On review, we examine the findings the trial court did make and ask whether those support the judgment; we do not examine the evidence to justify findings the trial court may have made — but did not — that might have supported the judgment. In any event to say that Father denied “all services” is simply incorrect.
Once the foregoing clearly erroneous findings are set aside, the findings that remain are in my view wholly insufficient to support the trial court’s judgment terminating Father’s parental rights. More particularly there is scant evidence — and certainly not clear and convincing evidence — to support the conclusion that the condition resulting in the children’s removal will not be remedied and that termination is in the children’s best interest.
In order to terminate a parent’s parental rights “the State must prove, by clear and convincing evidence, each and every element set forth in I.C. § 31-35-2-4(b)(2), (A)-(D).” In re G.Y., 904 N.E.2d 1257, 1261 (Ind.2009), reh’g denied. Relevant for our purposes the statute provides the State must prove, “[t]here is a reasonable probability that the conditions that resulted in the child’s removal or the reasons for placement outside the home of the parents will not be remedied.” Ind.Code § 31-35-2^f(b)(2)(B)(i). Where the State fails to prove “any one” of the statutory elements “it is not entitled to a judgment terminating parental rights.” G.Y., 904 N.E.2d at 1261.
In this case E.M. and El.M. along with five other of Mother’s children were removed from the parents’ home and placed in foster care because of “[Father’s] abuse *653 to [Mother] in the presence of the children.” CHINS Pet. Feb. 24, 2009 at 2. There is evidence that on March 9, 2009— shortly after the children’s removal — violence again erupted between Father and Mother. But there is no evidence of any domestic violence between Father and Mother after that date. The trial court seemed to fault Father for “contin[uing] to deny that he has issues with domestic violence.” Termination Order at 2. The implication of course is that because Father apparently had issues of domestic violence in March 2009 — and declined Court offered services for anger management — he still has such issues three years later. But Father has since engaged in anger management counseling and when questioned at the termination hearing acknowledged that he had “anger issues,” had “gotten upset ... beyond ... necessity,” “in instances [has] overreacted” and “could have responded better.” Tr. at 190, 203, 204. Further, Father has long since stopped living with Mother and her five additional children and instead is residing in Illinois with his wife of fifteen years, Y.M., and their two children. There is no evidence that Father and Y.M. have ever had a violent relationship, nor is there evidence that Father’s children with Y.M. or Y.M.’s two other children raised by Father have ever been the subject of state intervention.
Considering: (1) no evidence that there have been any instances of domestic violence between Father and Mother since 2009, three years before termination; (2) Father engaged in anger management counseling; (3) Father no longer lives with Mother but lives with his wife of many years in another state; and (4) no evidence of domestic violence between Father and his wife, it appears to me Father has actually carried a burden he has no duty to carry, namely, demonstrating that the conditions that led to the children’s removal— domestic violence in the home of Father and Mother — no longer exists. Stated somewhat differently, the State has failed to show by clear and convincing evidence that the conditions that led to the children’s removal will not be remedied. On this ground alone the State “is not entitled to a judgment terminating [this Father’s] parental rights.” G.Y., 904 N.E.2d at 1261.
Not only is there no clear and convincing evidence that the removal conditions will not be remedied, the evidence supporting the trial court’s conclusion that termination of Father’s parental rights is in the best interest of EM. and El.M. is likewise deficient. Specifically, the trial court found that Father “has not seen his children in over two years,” and that he and the children have not “bonded.” Termination Order at 2, 3.
First, whatever bonding occurred before Father’s incarceration — and the evidence is in conflict on this point — that bond obviously suffered during Father’s incarceration. But unlike the situation with Mother’s other children — the oldest of whom was age eleven at the time of termination — Father’s children were only three and four years of age at the time of termination. We have previously determined that despite a father’s lack of bonding, that is, “insufficient emotional attachment” with his two-year-old child, even with repeated visitation, was not sufficient to support terminating father’s parental rights. See In re I.A., 934 N.E.2d 1127, 1135-36 (Ind. 2010). See also G.Y., 904 N.E.2d at 1265 (considering child’s age of less than five years and mother’s imminent release from prison in reversing termination).
Further, upon release from incarceration Father immediately contacted DCS to establish visitation with E.M. and E1.M. but DCS denied his requests. See Tr. at 111. One might query how is bonding *654 possible when the State denies the very avenue by which it might occur? Nevertheless, when Father and stepmother appeared at a June 1, 2012 CHINS Review Hearing, the trial court ordered DCS to “make copies of all documentation [Father] has and submit it to the Court. DCS is to begin an interstate compact[3] of [Father’s] home in the State of Illinois for [El.M.].”[4] Review Hrg. Order, June 1, 2012 at 2. The record does not reflect the outcome of the interstate compact investigation. In similar fashion the record is silent on what occurred between June 2012 — when the trial court anticipated the reunification of Father and El.M. — and July 2012 when the trial court determined that termination of Father’s parental rights were in the best interest of E.M. and El.M. because of Father’s absence and lack of bonding. In my view there was no clear and convincing evidence on this point in June and the same was true a month later.
Finally, the majority invokes what it sees as the children’s “paramount need for permanency” as support for the trial court’s conclusion that termination is in E.M. and El.M.’s best interests. Op. at 647. I would first observe the trial court did not mention “permanency” as grounds for terminating Father’s parental rights. The order of termination does say “the children deserve a loving, caring, safe, and stable home.” Termination Order at 3. But this is an unassailable finding applicable to all children. The question is whether this finding “clearly and convincingly” supports the trial court’s judgment of terminating this Father’s parental rights. In my view it does not.
In any event, even if we assume that the older half-siblings who were school-aged suffered emotionally and behaviorally in the home of Father and Mother, and thus may have an urgent “need for permanency,” there is simply no evidence in this record that either E.M. or El.M., ages three and four at the time of termination, have ever suffered emotionally or behaviorally. Further, to make permanency the lodestar of the analysis would invert it. The guiding principle is the child’s best interests, and preserving a relationship with a fit parent is clearly in the best interest of the child. Cf. Wyle, supra at 35. As some commentators have noted, an overemphasis on permanency in the child welfare context can in some cases produce undesirable results. See, e.g., Paul Anthony Wilhelm, Note, Permanency at What Cost? Five Years of Imprudence Under the Adoption and Safe Families Act of 1997, 16 Notre Dame J.L. Ethics & Pub. Pol’y 617, 618-19 (2002) (asserting that the shift in national social policy focus from *655 reunification to expeditious resolution of child welfare cases in the name of permanency has contributed to the breakup of families of lower socio-economic status); Madelyn Freundlich, Expediting Termination of Parental Rights: Solving a Problem or Sowing the Seeds of a New Predicament?, 28 Cap. U.L.Rev. 97, 107 (1999) (recognizing that when “permanency alternatives in the law are cast as a dichotomy: reunification ... or termination ...” other arrangements for maintaining a child’s ties with birth families may not be pursued, ultimately to the detriment of the child’s best interests).
Compounding the risks of institutionally overvaluing “permanency” is the present social reality of the increase in children living in families headed by single mothers. See Carmen Solomon-Fears, et al., Cong. Research Serv., R 41481, Child Weilr-Being and Noncustodial Fathers 1 (2013). The effects on children can be far-reaching, including poor school performance, emotional and behavioral problems, becoming teenage parents, and poverty. Id. We should encourage rather than frustrate the efforts a father makes in attempting to take responsibility in raising his child or children. And while social science research and child welfare advocates recognize “significant benefits to children when non-custodial fathers remain involved in their lives,” op. at 647 (citation omitted), research also unfortunately indicates that “[h]istorically, [c]hild [wjelfare [s]ervices have systematically minimized the role and the involvement of the African-American father.” Working with the African American Father: The Forgotten Parent, California Public Child Welfare Training Academy Trainer Guide at 3 (2009). In training child welfare personnel in working with African-American families, agencies “traditionally place[ ] most ... emphasis on working with the mother with scant attention being paid to the father except as being an absent parent.” Id.[5] Cf Leslie Brown, et al., Manufacturing Ghost Fathers: The Paradox of Father Presence and Absence in Child Welfare, 14 Child & Family Social Work 25, 26 (2009) (observing in a study of Canadian child welfare cases that “fathers were rarely considered as placement resources, even when the alternative was permanent guardianship. Grandmothers, usually maternal, were more likely to be sought as a resource for children. Fathers who expressed interest in custody were typically told to get a lawyer....”).
The combination of an imperfect father, a system that presupposes the absence of African-American males from the household, and an institutional focus on permanency have all merged in this case resulting in the termination of “one of the most valued relationships in our culture.” Neal, 796 N.E.2d at 285 (quotation omitted). This certainly cannot be in E.M and El. M.’s best interest.
It bears repeating that “termination is intended as a last resort, available only when all other reasonable efforts have failed.” I.A., 934 N.E.2d at 1136. Of course it is true that we “need not wait until the child is irreversibly harmed ... before terminating the parent-child relationship.” Op. at 648 (quoting K.T.K., 989 N.E.2d at 1235 (quotation omitted)). But each case is different, each child is different, and each parent is different. And here I fail to see even the potential for harm to E.M. and E1.M. from continuing their parent/child relationship with Father, especially considering the lack of evidence that violence in Father and Mother’s home would not be (and had not already been) *656 remedied, and that just a few weeks prior to termination the trial court ordered an interstate compact for possible physical placement in Father and stepmother’s home in Illinois.
Finally, in affirming the trial court’s judgment, the majority says: “the evidence here was close” and “the trial court could reasonably have reached either conclusion [to permit or deny the State’s petition for termination of parental rights].” Op. at 649. But this is not a game of horseshoes and close is not good enough. In order to terminate a parent’s parental rights the State must prove its case by clear and convincing evidence. It has failed to do so. Therefore I would reverse the trial court’s judgment.

. "[E.M.] is a three year old African American male child who continues to develop age appropriately. [E.M.’s] socialization skills are improving. [ELM.] is a two year old African American female child who continues to appear healthy and is appropriately active.” CHINS Progress Report, Jan. 7, 2011 at 2.

. “[E.M.] is a four year old African American male child who is currently in preschool. [E.M.] is doing well in the home. [E1.M.] is a *652 three year old African American female child who has been screened for preschool. [El.M.] is doing well at home and gets along with her siblings.” CHINS Progress Report, May 17, 2012 at 2. "[E.M.] and [El.M.] attend the preschool program at Caroline Sibley Elementary School and are meeting developmental milestones.” Id. at 3.

. "The Interstate Compact on the Placement of Children ("ICPC”), enacted in all fifty states, provides a mechanism by which children can be sent to new foster or adoptive homes across state lines. The ICPC includes a reporting requirement that allows a receiving state to investigate the fitness of the proposed home and to determine whether the child may be placed according to a proposed plan.” In re Termination of Parent-Child Relationship of A.B., 888 N.E.2d 231, 234 n. 3 (Ind.Ct.App.2008) (citing I.C. § 31-28-4-1), trans. denied (emphasis added). We have recognized that no Indiana court has addressed the question of whether the ICPC applies to the interstate reunification of children with their natural parents, and other jurisdictions differ on the issue. See Bester v. Lake Cnty. Office of Family and Children, 839 N.E.2d 143, 145 n. 2 (Ind.2005).

. The court made no such order with regard to E.M., which would appear consistent with the court's notation that "[Father] is not the legal father of [E.M.].” Id. But curiously, DCS’s Predispositional Report reflects that Father established paternity of E.M. by paternity affidavit. DCS’s Predispositional Report of Oct. 23, 2008 at 5. See also Tr. at 71-72 (DCS case manager testifying that Father was listed on E.M.’s birth certificate).

. In this case the Case Manager testified that reunification with Father was never a part of the permanency plan for E.M. and El.M. See Tr. at 106-07.