## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Aug 18 2015, 9:34 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Patricia Caress McMath
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of:

S.M. & M.M.  (minor children)

and

M.M. (mother),

*Appellant-Respondent,*

*v.*

The Indiana Department of Child Services,

*Appellee-Petitioner.*

August 18, 2015

Court of Appeals Case No.
49A02-1502-JT-97

Appeal from the Marion Superior Court
The Honorable Marilyn A. Moores, Judge
The Honorable Larry E. Bradley, Magistrate

Trial Court Cause Nos. 49D09-1409-JT-386 & 49D09-1409-JT-387

**Bradford, Judge.**

# Case Summary

Appellant-Respondent M.M. ("Mother") gave birth to C.S., S.M. and M.M. (collectively, "the Children"),[1] minor children born in 2002, 2006, and 2010, respectively. In 2011, Appellee-Petitioner the Indiana Department of Child Services ("DCS") filed a petition alleging the Children were children in need of services ("CHINS"). Less than a month later the Children were removed from Mother's care over concerns about her behavior at a psychological examination. Mother had visitation with the Children until late 2011, but visitation was suspended due to Mother's inconsistent attendance, and she has not seen the Children since then.

Over the years, Mother has been evaluated many times and has been found to have unaddressed mental issues. Mother has not taken the steps necessary to address her issues. All attempts at therapy or other treatment for Mother's mental health issues have ended unsuccessfully and Mother has not completed other ordered services. Eventually, DCS changed the permanency plan for Children to adoption and petitioned for the termination of Mother's parental rights. The juvenile court held a hearing at which a DCS Family Case Manager ("FCM") and guardian *ad litem* ("GAL") both testified that termination was in

---

[1] The termination of Mother's parental rights as to C.S. is not at issue in this appeal. Moreover, none of the Children's fathers take part in this appeal.

the Children's best interests. The juvenile court granted DCS's petition to terminate Mother's parental rights as to S.M. and M.M., with Mother executing consent to C.S.'s adoption. Mother appeals, contending that DCS failed to establish that the conditions that led to the Children's removal are unlikely to be remedied, that continuation of the parent-child relationship poses a threat to Children, and that termination is in the Children's best interests. Because we conclude that DCS produced ample evidence to sustain the juvenile court's judgment, we affirm.

## Facts and Procedural History

[3] Mother was born on June 4, 1983. Mother gave birth to C.S., S.M. and M.M., minor children born on October 14, 2002, August 8, 2006, and July 21, 2010, respectively. On January 20, 2011, Mother admitted C.S. into Valle Vista, a mental health treatment center, claiming that C.S. had attempted to harm or kill S.M, molested S.M., shook M.M., screamed uncontrollably, and killed animals. FCM Michelle Vasquez investigated and interviewed Mother in Indianapolis. Mother told Vasquez that she and the Children had left Steuben County because the neighbors "had been climbing on her roof, they poisoned her kids and that they were nailing cats to the trees." Tr. p. 400. Mother told Vasquez that she intended to flee Indiana with S.M. and M.M., abandoning C.S., should DCS become involved. Mother told Vasquez that C.S. had molested S.M. twice and that she kept C.S. away from S.M. by locking her in a room with the windows nailed closed. During Mother's conversation with

FCM Vasquez, she also related her belief that the State of Indiana was poisoning the water, making her and the Children sterile, causing her hair to fall out, and giving the Children cholera.

[4] On January 27, 2011, DCS filed petitions alleging the Children were CHINS. On February 11, 2011, Mother submitted to a psychological examination at Aspire. Mother was described by an evaluator as "very anxious, tangential, hyper, extremely rapid speech, hostile, and that her thought content was positive for grandiose delusions, positive for persecutory delusions and paranoia." Ex. Vol. p. 189. The intake worker at Aspire called 911 in the belief that Mother was in need of emergency hospitalization. Mother fled Aspire and an emergency detention order was issued. On or about February 16, 2011, the Children were removed from Mother and have not been placed with her since.

[5] On May 23, 2011, the juvenile court adjudged the Children to be CHINS upon Mother's admission that she

> has mental health issues, for which she needs assessment and treatment. [Mother] has been unable to address [C.S.]'s behavioral issues, and believes [C.S.] has mental health issues which she is unable to address without assistance. [Mother] has been unwilling in the past to accept the help offered by [DCS] to address these issues, but is now willing to work with [DCS] and seek treatment for herself and her children that is recommended by involved service providers, including doctors, in order to reunify with her children.

Ex. Vol. pp. 26-27.

[6] On June 17, 2011, the juvenile court held a dispositional hearing, during which it ordered Mother to maintain contact with the FCM; sign any releases

necessary to monitor compliance; keep appointments with DCS, the GAL, and service providers; maintain suitable housing and income; refrain from the use of illegal substances; participate in home-based counseling; complete a psychological evaluation and comply with resulting recommendations; and visit with the Children.

In approximately January of 2012, Duge Butler took over as FCM. (Tr. 434). On September 10, 2014, DCS filed a petition to terminate Mother's parental rights to the Children ("TPR Petition"). The juvenile court conducted a hearing on the TPR Petition on January 12 and 13, 2015.

## I. Evidence Related to Mother's Mental Health

DCS presented evidence related to Mother's prior history with child welfare authorities and of mental illness. On January 16, 2004, child welfare authorities in Idaho removed C.S. from Mother's care due to C.S.'s failure to thrive and medical neglect. C.S. ultimately remained out of Mother's care for approximately three years.

As part of the Idaho case, Mother was evaluated in 2004 by psychologist David D. DeLawyer, Ph.D. Mother related to Dr. DeLawyer that she had run away from an abusive home at thirteen; lived for a time with a drug dealer who manufactured methamphetamine; and heavily used alcohol, marijuana, and methamphetamine. While Dr. DeLawyer ruled out bipolar disorder, he noted that Mother had a history of very dysfunctional relationships, met the criteria of antisocial personality disorder, exhibited strong patterns of paranoid personality

disorder, did not accept responsibility for her situation, and had a history of either not understanding C.S.'s needs or simply putting hers first. Dr. DeLawyer noted that there was little likelihood that Mother would be able to make the changes necessary for her to adequately parent C.S.

[10] In May of 2011, Mother submitted to an evaluation by clinical psychologist Jerome Modlik, Psy.D. Dr. Modlik determined that Mother was suffering from a psychiatric disorder, most likely a paranoid personality disorder; exhibited poor judgment in parenting; and had insight Dr. Modlik judged as "nil." Ex. Vol. p. 182. Dr. Modlik recommended that (1) Mother undergo a substance abuse evaluation, (2) Mother receive psychological and psychiatric treatment, (3) DCS provide supervised visitation with the Children, (4) the family receive counseling, (5) records from other child services agencies who have had dealings with Mother be obtained, (6) Mother receive assistance in acquiring government aid, and (7) precautions should be taken to prevent Mother from fleeing Indiana.

[11] On August 8, 2013, Mother was evaluated by psychologist J. Mark Dobbs, Psy.D. Dr. Dobbs diagnosed Mother with post-traumatic stress disorder in partial remission and adjustment disorder with mixed disturbance of mood and conduct.

## II. Compliance with Mental Health Services

[12] Mother acknowledged that the juvenile court ordered her to complete the recommendations of her psychological evaluation and complete intensive

therapy. DCS referred Mother for evaluations, home-based therapy, and treatment to various providers. Mother, however, made no progress in therapy, dispite her mental health issues being the largest obstacle to reunification. Mother's four referrals to home-based therapy all closed unsuccessfully due to Mother's noncompliance. Mother did not complete the therapy recommended by Dr. Modlik. Mother's failure to address her mental health issues resulted in DCS being unable to recommend reunification and is the main barrier to reunification with the Children.

[13] Mother's home-based therapists all expressed concern with Mother's lack of insight into how her behavior and mental health issues caused the Children's removal and prevented reunification. Mother's last home-based therapist, Elizabeth Rojek, began working with Mother in December of 2013. Rojek found Mother to be paranoid, with thought processes that were non-logical and tangential. Rojek suspected that Mother "broke with reality[.]" Tr. p. 363. Rojek opined that, due to Mother's lack of insight as to how her behavior was unsafe, her mental health issues would put the Children at risk. Mother's therapy was closed in February of 2014.

## III. Visitation

[14] By June of 2011, Mother's supervised visits with Children were at eight hours per week. By September of 2011, Mother began missing visits and had missed six by the end of October. Mother's stories about why she missed visitation were inconsistent. The visitation supervisor was concerned with Mother's

paranoia as being detrimental to the Children. Mother called C.S. "a rapist and a murderer[,]" Tr. p. 151, and believed that C.S. was the reason for DCS's involvement. On November 10, 2011, the juvenile court granted DCS's motion to suspend visitation with the Children, and Mother has not seen them since.

## IV. Other Evidence

[15] Children were placed in foster care in February of 2011, and S.M. is still in that original placement. M.M. and C.S. have been placed with their current foster parents since July of 2012. M.M. has integrated into her foster family, thrives there, and is bonded to C.S. Separation would devastate C.S. and M.M. All of the foster parents ensure that all three children maintain their sibling relationship.

[16] S.M. has been diagnosed with Asperger's syndrome and ADHD and requires stability: any change "throws him off completely. His behavior changes, his attitude, his anger issues come up." Tr. p. 95. S.M. receives therapy and other services at home and school. S.M. was, at first, destructive, but has improved in the foster home, due to the structure, therapies, and medications. Mother does not believe that medications should be used to treat Asperger's or ADHD.

[17] DCS recommended termination of Mother's rights because (1) Mother has been unable to demonstrate that she is capable of meeting Children's needs, (2) the CHINS case has been open for four years, and (3) it is important for the Children to know where they will be. GAL Danielle Pierson testified that adoption was the best permanency plan for the Children because of (1)

Mother's lack of compliance with services; (2) Mother's lack of insight; (3) Mother's lack of stability dating back to the Idaho case; and (4) Mother's tendency to return the Children to her parents, who, according to Mother, were abusive to her. FCM Butler testified that in over four years, none of the Children's parents, including Mother, had demonstrated that they were capable of addressing their own needs "in order to ensure the health, welfare and stability of the children." Tr. p. 463. DCS's plan is for adoption, which would allow the Children to have permanency, and the DCS has located pre-adoptive homes form the Children.

[18] On January 22, 2015, the juvenile court issued its order terminating Mother's parental rights in C.S., S.M., and M.M., which order provides as follows:

### ORDER TERMINATING THE PARENT-CHILD RELATIONSHIP

This matter came before the Court on January 12th and 13th, 2015, for evidence upon a Petition for Termination of the Parent-Child Relationship. Petitioner, The Indiana Department of Child Services, Marion County, "IDCSMC" appeared by family case manager Duge Butler, Jr. and by counsel, Donna Carr. Respondent mother [Mother] appeared in person and by counsel, Roberta Staten, Kevin Kolbus, and Katherine Cornelius. Danielle Pierson of Child Advocates, Inc. appeared in person and by counsel, Toby Gill. Respondent father [D.A.] failed to appear. Respondent father [R.M.] failed to appear. Respondent father [S.S.] failed to appear.

### Cause of Action

The Indiana Department of Child Services, Marion County has brought an action to involuntarily terminate the parent-child

relationship between respondent parents and their respective children under IC 31-35-2-1 alleging:

1.      The children have been found to be in need of services;

2.      The children have been removed from the home of the parents for at least six (6) months under a disposition decree;

3.      There is a reasonable probability that (a) the conditions that resulted in the removal of the children outside the home will not be remedied, (b) the reasons for the continued placement of the children outside the parents' home will not be remedied, or (c) the continuation of the parent-child relationship poses a threat to the well-being of the children;

4.      Termination of the parent-child relationship is in the best interests of the children;

5.      There is a satisfactory plan for the care and treatment of the children.

These allegations must be established true by clear and convincing evidence. IC 31-34-12-2. If so proved, the parent-child relationship shall be terminated. IC 31-35-2-8 (a).

**Findings**

Upon evidence presented, the Court now finds *by clear and convincing evidence*:

1.      [Mother] is the mother of [C.S.], [S.M.] and [M.M.], minor children born on October 14, 2002, August 8, 2006, and July 21, 2010, respectively.

2.      [Mother] has executed consents for [C.S.]'s adoption.

3.      [S.S.] is the father of [C.S.].

4.      [R.M.] is the father of [S.M.].

5.      [D.A.] is the father of [M.M.].

6.      Child in Need of Services Petitions "ChINS" were filed on the children on January 27, 2011, under Cause Number 49D091110JC03318-20 after IDCSMC investigator Michelle Vasquez received a 310 report and interviewed [Mother] at a

hotel where the family were staying, finding concern over unreported sexual contact between [C.S.] and [S.M.], and the method of keeping [C.S.] away from [S.M.] by locking her upstairs and nailing windows shut. Ms. Vasquez also had concerns over [Mother]'s mental health observing her rapid speech and thoughts "all over the place", and [Mother]'s concerns about Indiana putting poison in the water making her sterile and the children's hair fall out, and her neighbor's actions against the family.

7.   Just prior to the ChiNS case being filed, [Mother] had placed [C.S.] in Valle Vista Health Services for perceived behavior issues, including that [C.S.] shook [M.M.] and threw her on the floor.

8.   [C.S.] was previously the subject of an Idaho Children and Family Services matter for three and one-half years, and was placed out of her mother's care.

9.   [An] [i]nitial Hearing was held on January 27, 2011, at which time [C.S.] was ordered detained with continued placement at Valle Vista and therapeutic foster care.

10.   [S.M.] and [M.M.] continued placed in their mother's care conditioned upon [Mother] undergoing a psychological evaluation and following all recommendations up to and including taking prescription medicines.

11.   A referral was made to Adult and Child Mental Health for a psychological evaluation and intensive family preservation services.

12.   [Mother] did not wish to use services within the IDCS providers.

13.   [Mother] went to Aspire Indiana for an assessment on February 16, 2011. Upon presenting as manic with illogical thought process, it was recommended [Mother] be detained in the hospital. [Mother] instead left Aspire with [S.M.] and [M.M.] who were then detained and placed outside their mother's care.

14. On May 23, 2011, the children were found to be in need of services after [Mother] admitted to mental health issues for which she needed an assessment and treatment, and that she needed assistance with [C.S.]'s mental health needs.

15. Disposition for [Mother] was held on June 17, 2011, at which time the children's placement continued outside the home. They had been removed for at least six (6) months prior to this termination action being filed on September 10, 2014.

16. Services ordered included completing a psychological evaluation and successfully complete any recommendations that result from the evaluation, and home based counselling. In addition, [Mother] was ordered to maintain weekly contact with the IDCSMC, sign any release needed to monitor compliance with services, and attend all scheduled visitations with the children.

17. Intensive family preservation services were closed after the children were removed from [Mother].

18. Home based therapy was referred in March of 2011, but closed due to [Mother]'s non-participation.

19. At the May 23, 2011, hearing when the children were found to be in need of services, [Mother] admitted that she had been unwilling in the past to accept the help offered by the Department of Child Services to address her issues. But was now willing to work with the Department of Child Services and seek treatment for herself and her children that was recommended by involved service providers, including doctors, in order to reunify with her children.

20. [Mother] did not wish to attend Adult and Child for a psychological evaluation and found Dr. Jerome Modlik to do the evaluation on May 16, 2011.

21. During the evaluation, Dr. Modlik observed [Mother]'s speech to be fast, seemingly pressured, and that she rambled incoherently or tangentially.

22.    The type of speech and thought process was observed by service providers and on occasion during this termination trial.

23.    Dr. Modlik believed that [Mother]'s testing was consistent with a paranoid personality disorder, or possible paranoid delusional disorder.  Her symptoms appeared to be associated with anxiety and fear.

24.    [Mother] has demonstrated paranoia during the chins case on several occasions, not trusting agencies and agency service providers, audio or video taping excessively, dismissing several attorneys, requesting a new ChINS judge, and testifying that all witnesses but one deliberately lied during this termination trial.

25.    Dr. Modlik reported that individuals with high scores on Paranoia scale are generally described as overtly suspicious, angry and fearful as well as hypersensitive to perceived slights and insults. They have a difficulty forming intimate and satisfying interpersonal relationships and prefer to keep people at a distance less they be hurt or harmed in some way.

26.    [Mother]'s Paranoid personality is a very difficult condition to change.

27.    Dr. Modlik found that the severity of [Mother]'s disorder is likely to impact her capacity to parent small children to a greater or lesser extent, and that her difficulty with empathy for her children's negative behaviors is probably the single most important liability affecting her capacity to effectively parent her children.

28.    [Mother] stated she was fed up with [C.S.]'s behavior and she wished to consent to [C.S.]'s adoption early in the ChINS case at which time she was age nine.

29.    [C.S.] has been diagnosed with having Post Traumatic Stress Disorder, suffering from neglect and sexual abuse, and Reactive Attachment Disorder.

30.    Dr. Modlik found that [Mother] made poor judgments and her insight was judged to be nil.

31.   Dr. Modlik's recommendations included [Mother] undergo psychological and psychiatric treatment from a quality psychotherapeutic service.

32.   In 2004, during [C.S.]'s Idaho Children and Family Services case, [Mother] underwent a comprehensive psychological evaluation at which time she was found to exhibit pervasive paranoid ideation and possibly mild thought disturbance.

33.   [Mother] sought out a psychological examination from Dr. Dobbs on August 8, 2013. Due to information based on self-reporting only, and a lack of personality testing or objective testing, the results are not nearly as comprehensive as her 2004 and 2011 evaluations.

34.   [Mother] has suffered a difficult and traumatic childhood and adolescence.

35.   Intensive psychotherapy was referred for [Mother] a second time in June of 2011, after Dr. Modlik's recommendation.  That referral was closed unsuccessfully due to [Mother]'s inconsistent attendance, her behavior issues during sessions, and lack of progress.

36.   Visitation was suspended by the ChINS Court on November 10, 2011, based on [Mother]'s inconsistency in visiting, her detrimental favoring of [S.M.] during visits, and her lack of participation in services.

37.   [Mother] has not seen her children since October of 2011.

38.   A third therapy referral was made in August of 2012, which was also closed.

39.   A clinical assessment was referred to Cummins Mental Health in January of 2013.

40.   In December of 2013, a fourth therapy referral was made and Kate Rojek of Life Solutions Counseling started working with [Mother].  Ms. Rojek thought [Mother] was disassociated from reality at times and her thought process to be non-logical and tangential and very paranoid.  [Mother] blamed [C.S.] for

IDCSMC involvement and focused negatively on service providers, including Ms. Rojek, and IDCSMC as deliberately sabotaging her case.

41.     In February of 2014, no progress had been made toward the goal of [Mother] obtaining insight. Most of the therapy sessions were taken up with trying to re-direct [Mother]. Due to [Mother]'s significant mental health needs, Ms. Rojek felt that more intensive psychological services were needed.

42.     Based on recommendations from Dr. Modlik, and [Mother] wanting outside agency provider help, the IDCSMC sought funding for [Mother] to obtain treatment from Dr. Ray at Meridian Psychological Associates. Funding was approved but a release of information was needed to monitor services prior to funds being released. [Mother] failed to execute a release.

43.     [C.S.] and [M.M.] were placed in their current foster home in July of 2012. This home is pre-adoptive. [C.S.] is in therapy to address the trauma she sustained. [C.S.] exhibited behavior problems when placed in the home. Her behaviors have improved. Her caregivers understand [C.S.]'s diagnosis and are meeting all her needs, including special needs. She is no longer showing signs of Reactive Attachment Disorder.

44.     [M.M.] has fit in with the family since her placement.

45.     [C.S.] watches out for her sister, and they share a deep bond. Separating the two would be devastating.

46.     [S.M.] was placed in his home in early 2001. He has been diagnosed with Asperger's and Attention Deficit Hyperactivity Disorder. He receives Vyvanse and Risperdal. He exhibited outbursts which have become less intense and less frequent. [S.M.] needs routine in his schedule to maintain his behavior.

47.     [Mother] does not believe [S.M.] has Asperger's and does not believe he should be taking medication.

48.     [S.M.]'s current caretakers do not plan on adopting him due to their age. The do wish to keep meeting his needs in their

home until a pre-adoptive family is found. [S.M.] has been found to act out sexually and he is scheduled for a psychological exam.

49. The IDCSMC has family, relatives of [S.M.]'s current caregivers, that are wishing to adopt [S.M.], and [S.M.] knows them.

50. The family case manager and Guardian ad Litem believe that [S.M.] is an adoptable child.

51. There is a reasonable probability that the conditions that resulted in [S.M.] and [M.M.]'s removal and continued placement outside the home will not be remedied by their mother. [Mother] has significant mental health issues and has not made any progress in addressing these issues in the four years since the ChINS case was filed. She continues to lack insight into her condition.

52. Continuation of the parent-child relationship with [Mother] poses a threat to the children's well-being in that it would pose a barrier to obtaining permanency for them through an adoption when their mother is unable to parent in a safe manner. It would devastate [M.M.] to leave her sister and the caregivers she now knows as her family. The Court has major concerns whether [S.M.] would receive the treatment and routine his special needs require and if not, will his mother then treat him detrimentally as she did [C.S.] for negative behavior.

53. [C.S.] was found to be in need of services and disposition was held on [S.S.] on July 8, 2011, at which time her placement continued outside the home. She had been removed for at least six (6) months prior to this termination action being filed.

54. There is a reasonable probability that the conditions that resulted in the removal and continued placement of [C.S.] outside the home will not be remedied by her father. [S.S.] has not made the effort needed to commit to parenting [C.S.] by not wanting to participate in therapy and not participating in this termination case. [S.S.] last saw [C.S.] three years ago. Another barrier remedying conditions remains the fact that [C.S.] wants

no contact with her father and continues to identify him as a perpetrator of sex abuse on her.

55.    Continuation of the parent-child relationship with [S.S.] poses a threat to [C.S.]'s well-being in that it would pose as a barrier to obtaining permanency for her through an adoption when her father remains seemingly uninterested to do what is needed.  Further, [C.S.] does not want to see her father and it would be detrimental to separate her from her sister.

56.    [S.M.] was found to be in need of services and disposition was held for [R.M.] on July 8, 2011, at which time [S.M.]'s placement remained out of home.  He had been removed for at least six months prior to this termination action being filed.

57.    There is a reasonable probability that the conditions that resulted in the removal and continued placement of [S.M.] outside the home will not be remedied by his father.  [R.M.] continues to reside in Idaho and last saw [S.M.] in 2012.  Four ICPCs have been denied and no services have been completed to address concerns of substance abuse, instability and [R.M.]'s criminal history.  [R.M.] failed to participate in this termination action demonstrating his lack of concern for his son.

58.    Continuation of the parent-child relationship with [R.M.] poses a threat to [S.M.]'s well-being in that it would be a barrier to obtaining permanency for [S.M.] into a family that will provide for all of his needs.

59.    On May 23, 2011, [D.A.] waived a formal fact-finding hearing after [Mother] admitted to [M.M.] being in need of services.

60.    Disposition was held for [D.A.] on June 17, 2011, at which time [M.M.]'s placement continued outside the home.  She had been removed for at least six (6) months prior to this termination action being filed.

61.    There is a reasonable probability that the conditions that resulted in the removal and continued placement of [M.M.] outside the home will not be remedied by her father.  [D.A.] has

demonstrated he is either unable or unwilling to be a parent to [M.M.] by his lack of completing home based services and lack of visitation.

62.    Continuation of the parent-child relationship with [D.A.] poses a threat to [M.M.]'s well-being in that it would pose a barrier to obtaining permanency for [M.M.] by being adopted into the only family she knows and with her sister.

63.    Termination of the parent-child relationship is in the best interests of the children.  Termination would allow them to be adopted into a stable and permanent home where all their needs will be safely met.

64.    There exists a satisfactory plan for the future care and treatment of the children, that being adoption.

65.    The Guardian ad Litem agrees with adoption as being the plan for permanency.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED** : that the parent-child relationship between [S.M.] and [M.M.] and [Mother] is hereby terminated.  The parent-child relationship between [C.S.] and [S.S.] is hereby terminated.  The parent-child relationship between [S.M.] and [R.M.] is hereby terminated.  The parent-child relationship between [M.M.] and [D.A.] is hereby terminated.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** : that all rights, powers, privileges, immunities, duties and obligations, any rights to custody, parenting time or support, pertaining to the relationship are permanently terminated, including the need to consent to adoption.

Appellant's App. pp. 24-30.

# Discussion and Decision

[19]    The Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise her children.  *Bester v.*

*Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005). Further, we acknowledge that the parent-child relationship is "one of the most valued relationships of our culture." *Id.* However, although parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet her responsibility as a parent. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied.* Therefore, parental rights are not absolute and must be subordinated to the children's interest in determining the appropriate disposition of a petition to terminate the parent-child relationship. *Id.*

[20] The purpose of terminating parental rights is not to punish the parent but to protect the children. *Id.* Termination of parental rights is proper where the children's emotional and physical development is threatened. *Id.* The juvenile court need not wait until the children are irreversibly harmed such that their physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.*

[21] Mother contends that the evidence presented during the evidentiary hearing was insufficient to support the juvenile court's order terminating her parental rights to S.M. and M.M. In reviewing termination proceedings on appeal, this court will not reweigh the evidence or assess the credibility of the witnesses. *In re Involuntary Termination of Parental Rights of S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). We only consider the evidence that supports the juvenile court's decision and reasonable inferences drawn therefrom. *Id.* Where, as here, the juvenile court includes findings of fact and conclusions thereon in its

order terminating parental rights, our standard of review is two-tiered. *Id.* First, we must determine whether the evidence supports the findings, and, second, whether the findings support the legal conclusions. *Id.*

[22] In deference to the juvenile court's unique position to assess the evidence, we set aside the juvenile court's findings and judgment terminating a parent-child relationship only if they are clearly erroneous. *Id.* A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. *Id.* A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *Id.*

[23] In order to involuntarily terminate a parent's parental rights, DCS must establish by clear and convincing evidence that:

> (A) one (1) of the following exists:
>
>> (i) the child has been removed from the parent for at least six (6) months under a dispositional decree;
>>
>> (ii) a court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made; or
>>
>> (iii) the child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) there is a reasonable probability that:

> (i) the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied; or

> (ii) the continuation of the parent-child relationship poses a threat to the well-being of the child;

(C) termination is in the best interests of the child; and

(D) there is a satisfactory plan for the care and treatment of the child.

[24] Although Mother contends that she was denied the process due to her, we agree with DCS's characterization of the argument as a challenge to the sufficiency of the evidence to support the juvenile court's decision. Specifically, Mother contends that DCS presented insufficient evidence to establish that the conditions leading to the removal of the Children from her would not be remedied, that continuation of the parent-child relationship posed a threat to the Children, and that termination was in the Children's best interests.

## I. Reasonable Probability that the Conditions Resulting in Removal Would Not be Remedied

[25] Mother contends that the record does not establish that the reasons for the Children's removal would not be remedied.

> In determining whether "the conditions that resulted in the child [ren]'s removal ... will not be remedied," *id.*, we "engage in a two-step analysis," [*K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cnty. Office*, 989 N.E.2d 1225, 1231 (Ind. Ct. App. 2013)]. First, we identify the conditions that led to removal; and second, we "determine whether there is a reasonable probability that those conditions will not be remedied." *Id.* (quoting [*In re I.A.*, 934

N.E.2d 1127, 1134 (Ind. 2010)]) (internal quotation marks omitted). In the second step, the trial court must judge a parent's fitness "as of the time of the termination proceeding, taking into consideration evidence of changed conditions," *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 152 (Ind. 2005)—balancing a parent's recent improvements against "habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation." *K.T.K.*, 989 N.E.2d at 1231 (quoting *Bester*, 839 N.E.2d at 152) (internal quotation marks omitted). We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *See K.T.K.*, at 1234. Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior.

*In re E.M.*, 4 N.E.3d 636, 642-43 (Ind. 2014) (footnote omitted).

[26] At the termination hearing, Mother acknowledged mental health issues. DCS presented testimony that Mother's mental health issues were the biggest obstacle to reunification. Although Mother also acknowledged that she had been ordered to complete treatment, she admitted that she had not done so. Consequently, Mother has made no progress in addressing her mental health issues.

[27] Mother cites several cases for the proposition that mental health issues, standing alone, are not a proper basis for termination of parental rights and argues that there was no evidence that her issues had negatively impacted the Children. The record does not support this argument. Mother acknowledges Dr. Modlik's testimony that her lack of empathy with the Children is a liability

in effective parenting, that her untreated mental health issues meant that she needed assistance in meeting C.S.'s needs, and that visitation with the Children was suspended because Mother was not making progress with ordered services. Additionally, the trial court made unchallenged findings regarding Dr. Modlik's evidence, namely that "the severity of [Mother]'s disorder is likely to impact her capacity to parent small children to a greater or lesser extent, and that her difficulty with empathy for her children's negative behaviors is probably the single most important liability affecting her capacity to effectively parent her children." Appellant's App. pp. 26-27.

[28] Moreover, Mother's therapists were universal in their opinion that Mother's lack of insight prevented reunification, and one opined that her lack of insight prevented her from keeping the Children safe. Rojek testified that Mother's mental health issues would put the Children at risk and that without the insight that Mother lacked, there was no confidence that the Children would be safe in Mother's care.

[29] As far back as 2004, Mother was diagnosed with antisocial personality disorder and exhibited strong patterns of paranoid personality disorder. Mother has since been evaluated for mental illness at least twice, with one evaluator concluding that Mother likely had a paranoid personality disorder and the second diagnosing her with post-traumatic stress disorder and adjustment disorder with mixed disturbance of mood and conduct. Despite substantial evidence that Mother is suffering from mental illness and that her illness negatively affects her ability to care for the Children, Mother has done little to

address the situation. Over the course of several years, Mother has made essentially no progress. We cannot say that the juvenile court abused its discretion in concluding that the conditions that resulted in the Children's removal are unlikely to be remedied.

## II. Parent-Child Relationship Posed a Threat to the Children

[30] Mother contends that DCS failed to produce sufficient evidence to establish that a parent-child relationship between her and the Children posed a threat to them. Indiana Code subsection 31-35-2-4(b)(2)(B) is written in the disjunctive, and the juvenile court need only find *either* that the conditions resulting in removal will not be remedied or that the continuation of the parent-child relationship poses a threat to the children. *In re C.C.*, 788 N.E.2d 847, 854 (Ind. Ct. App. 2003), *trans. denied*. As we have already upheld the trial court's conclusion that the conditions resulting in removal would not be remedied, we need not address Mother's argument in this regard further.

## III. Children's Best Interests

[31] Mother also contends that DCS failed to prove by clear and convincing evidence that termination of her parental rights was in the Children's best interests. We are mindful that in determining what is in the best interests of the Children, the juvenile court is required to look beyond the factors identified by DCS and look to the totality of the evidence. *McBride v. Monroe Cnty. Office of Family and Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In doing so, the

juvenile court must subordinate the interests of the parents to those of the children involved. *Id.* Furthermore, this court has previously determined that the testimony of a GAL regarding the children's need for permanency supports a finding that termination is in the children's best interests. *In the matter of Y.E.C.*, 534 N.E.2d 273, 276 (Ind. Ct. App. 1992).

[32] As Mother acknowledges, both FCM Butler and GAL Pierson recommended termination of Mother's parental rights as being in the Children's best interests. This evidence alone is sufficient to sustain the juvenile court's finding that termination is in the Children's best interests. *See, e.g.*, *In re T.F.*, 743 N.E.2d 766, 776 (Ind. Ct. App. 2001) (concluding that testimony of GAL and family case manager was sufficient to sustain finding that termination was in the child's best interests). Mother cites to *In re Termination of Parent-Child Relationship of A.B.*, 888 N.E.2d 231, 239 (Ind. Ct. App. 2008), *trans. denied*, for the propositions that FCM and GAL testimony "alone may not serve as a basis for termination of parental rights [and a] parent's right to his or her children may not be terminated solely because a better place to live exists elsewhere." The juvenile court's decision in this case did not solely depend on FCM and GAL testimony, however, and this proceeding is not simply a matter of finding a better place for the Children to live. As the juvenile court's comprehensive findings demonstrate, the record is replete with evidence of Mother's inability or unwillingness to be an effective parent to the Children. In the over four years since the Children were removed from Mother's care, there is essentially no evidence of any progress whatsoever in addressing the issues that caused the

removal. We conclude that the juvenile court did not abuse its discretion in concluding that termination of Mother's parental rights was in the Children's best interests.

[33] The judgment of the juvenile court is affirmed.

May, J., and Crone, J., concur.